**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CANDICE D'CUNHA | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | AMENDED COMPLAINT FOR DECLARATOR AND INJUNCTIVE RELIEF |
| **Plaintiff,** | | |
| v. | | Civil Action No. 1:22-cv-988 |
| NORTHWELL HEALTH SYSTEMS | | |
| **Defendant** | | |

**<u>AMENDED COMPLAINT</u>**

**<u>INTRODUCTION</u>**

1.  Candice D'Cunha was a resident at Northwell Health Systems Staten Island University Hospital. There she worked since the summer of 2020, receiving stellar performance reviews throughout her time at Northwell. She worked through much of the COVID-19 pandemic, even catching COVID herself with an infant at home.

2.  Despite this hard work, dedication, and sacrifice on behalf of Northwell Health Systems and its patients, Northwell Health Systems fired Dr. D'Cunha in October of last year while she was four months pregnant.

3.  This was not because of poor performance as an employee or as a doctor; it was not

because Northwell found that she was sick or presented an actual threat to her patients or co-workers in any way. It was because Northwell insisted that Dr. D'Cunha take a vaccine that she could not accept as a matter of concern for her unborn child and her conscience, medical training, common sense, and religious beliefs.

4.   In seeking to exert economic pressure on the question of whether she would accept medical treatment, Northwell Health Systems abandoned its commitment to the fundamentals medical ethics—the principal of informed consent in particular.

5.   In refusing to accommodate Dr. D'Cunha's pregnancy, religious beliefs, and medical condition, Northwell also violated state and federal law.

## JURISDICTION AND VENUE

6.   Plaintiff seeks relief pursuant to the civil enforcement provisions of the Pregnancy Discrimination Act and the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Americans with Disabilities Act, 42 U.S.C. § 12101.

7.   This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4) because this action arises under the laws of the United States.

8.   Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, actions, or omissions giving rise to the claim occurred in this judicial district, where Northwell Health Systems Staten Island Staten Island University Hospital is principally located.

9.   This Court may also issue declaratory relief pursuant to 28 U.S.C. § 2201. Additionally, "[f]urther necessary or proper relief based on a declaratory judgment may [also] be granted ...," including via injunction. *See Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A

declaratory judgment can then be used as a predicate to further relief, including an injunction. 28 U.S.C. § 2202 ....").

10. This Court also has concurrent jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

## PARTIES

11. Plaintiff Candice D'Cunha is a 2020 graduate of Kent State University College of Podiatric Medicine. She Matched in January 2020 with Staten Island University Hospital Northwell for her residency and began work there in June of 2020.

12. Northwell Health Systems is a New York domestic not-for-profit corporation headquartered in Westbury, Nassau County, New York. Northwell is the parent company of Staten Island University Hospital, located in Staten Island, where Dr. D'Cunha worked. Northwell Health Systems is the largest health provider in New York.[1]

## FACTUAL BACKGROUND

13. Dr. D'Cunha lived in New York City upon arriving in the United States in August of 2008. She received an education there and worked her way into medical school at Kent State

---

1 *See, e.g.*, Brian Rosenthal, *The largest hospital system in New York sued 2,500 patients for unpaid medical bills after the pandemic hit.*, NEW YORK TIMES, (January 6, 2021), available at https://www.nytimes.com/2021/01/06/world/the-largest-hospital-system-in-new-york-sued-2500-patients-for-unpaid-medical-bills-after-the-pandemic-hit.html?auth=login-email&login=email (last accessed February 3, 2022)("When the coronavirus began spreading through New York, Gov. Andrew M. Cuomo ordered state-run hospitals to stop suing patients over unpaid medical bills, and almost all of the major private hospitals in the state voluntarily followed suit by suspending their claims. But Northwell Health, which is the state's largest health system and is run by one of Mr. Cuomo's closest allies, sued more than 2,500 patients last year, records show.")
.

University College of Podiatric Medicine.

14. During medical school at Kent State, then, an externship in the City was a natural choice. She accepted an offer of an externship at Staten Island University Hospital ("SIUH" or "SIUH Northwell") and worked there in August of 2019.

15. Dr. D'Cunha then interviewed for her residency at SIUH in January of 2020, and applied in February 2020.

16. SIUH Northwell informed Dr. D'Cunha that she matched for a residency in March, 2020.

17. Dr. D'Cunha graduated in May of 2020 and began her residency at SIUH Northwell on June 22, 2020.

18. Dr. D'Cunha progressed nicely throughout her residency and received good reviews.

19. Dr. D'Cunha was pregnant when she began her residency and gave birth to her daughter in October of 2020.

20. In February of 2021, Dr. D'Cunha started experiencing symptoms consistent with COVID-19, which a positive test confirmed.

21. As a result, Dr. D'Cunha missed roughly ten days of work while she recovered in the February-March 2021 timeframe. She had vertigo symptoms that continued for an additional six weeks.

22. On August 2, 2021, SIUH Northwell announced a mandate that its employees must receive a COVID-19 vaccine or receive a religious or medical exemption by September 27, 2021, or face termination.

23. Northwell never published any criteria by which it would grant religious exemptions

to its mandate.

24. Upon information and belief, Northwell never published any criteria by which it would grant medical exemptions.

25. Upon information and belief, Northwell never *established* any criteria by which it would grant medical exemptions.

26. On September 3, 2021, Dr. D'Cunha submitted a request for a religious exemption. (See Exhibit A.)

27. On September 4, 2021, Northwell verbally informed Dr. D'Cunha that they were no longer accepting any religious exemption requests.

28. On September 9, 2021, Dr. D'Cunha submitted a request for a medical exemption. (See Exhibit B.)

29. On September 20, 2021, Northwell informed Dr. D'Cunha that they had denied her request for medical exemption. (See Exhibit C.)

30. On September 23, 2021, Dr. D'Cunha appealed Northwell's decision on her medical exemption request.

31. On September 29, 2021, Northwell informed Dr. D'Cunha that it rejected the appeal of her medical exemption request. (See Exhibit D.)

32. On September 30, 2021, Kate Rafla, Northwell Director of Operations at SIUH, contacted Dr. D'Cunha to inform her that Northwell could not locate her request for religious exemption. (See Exhibit E.)

33. Dr. D'Cunha re-submitted her request for religious exemption the same day.

34. On October 1, 2021, Northwell informed Dr. D'Cunha that it had rejected her request for religious exemption in which it referenced a stay on New York state's mandate and stated in

relevant part:

> in an effort to provide clarity to you while we await the court's final
> determination and in an effort to address its operational concerns…In accord with
> the principles that would apply should such religious exemptions be permitted, we
> nevertheless have determined that your religious exemption request must be
> denied as it would create an undue hardship. (See Exhibit F.)

35. On October 1, 2021, while she was seeing patients, Northwell summoned Dr. D'Cunha and hand-delivered her a letter of termination back-dated to September 28. (See Exhibit G.)

36. Later that day, Amy Durante, Northwell Director of Medical Education, informed Dr. D'Cunha that, as a resident, she was entitled to a delayed termination date and an appeals process. She followed up with a letter to this effect dated October 5, 2021. (See Exhibit H.)

37. On October 8, Northwell provided Dr. D'Cunha with a second termination letter stating that October 7 had been her last day of work. (See Exhibit I.)

38. Dr. D'Cunha requested an appeal, and on November 22, 2021, participated in an internal hearing of Northwell's Adverse Action Review Committee that Northwell conducted to review its termination. (See Exhibit J.)

39. On Christmas Eve, December 24, 2021, Northwell delivered to Dr. D'Cunha the decision of the Adverse Action Review Committee that it stood by its decision to terminate her. (See Exhibit K.)

40. Northwell did not reach an independent determination that Dr. D'Cunha posed an increased health threat to any of her patients or co-workers that necessitated the steps it took.

41. Northwell never made an independent determination that Dr. D'Cunha posed an increased health threat to any of her patients or co-workers as a result of not having taken the COVID-19 vaccine.

42. Dr. D'Cunha filed a complaint with the Equal Employment Opportunity Commission (EEOC), charge number 520-2022-00721.

43. The EEOC issued a *Notice of Right to Sue* on November 5, 2021. (See Exhibit L.)

44. Upon information and belief, Northwell granted exemptions to several of its employees in order to accommodate their religious beliefs.

45. Upon information and belief, Northwell granted exemptions to several of its employees to accommodate their pregnancies.

46. Upon information and belief, Northwell granted exemptions to several of its employees to accommodate their medical conditions.

47. Northwell made no attempt to accommodate Dr. D'Cunha's pregnancy, medical condition, or religious beliefs.

48. Northwell made no showing that any such accommodation would present an undue hardship.

49. Dr. D'Cunha remains unemployed.

## COUNT ONE

### Discrimination on the basis of sex.

50. Paragraphs 13-51 are incorporated herein.

51. The Civil Rights Act of 1964, 42 U.S.C 2000e-2(a)(1) prohibits discrimination on the basis of sex.

52. In 1978, Congress Amended the Civil Rights Act, defining "sex" to include "pregnancy, childbirth, or related medical conditions."

53. In refusing to accommodate Dr. D'Cunha's request for exemption because of her

7

pregnancy and firing her, Northwell discriminated against her on the basis of sex.

## COUNT TWO
**Discrimination on the basis of religion.**

54. Paragraphs 13-51 are incorporated herein.

55. The Civil Rights Act of 1964, 42 U.S.C 2000e-2(a)(1) prohibits discrimination on the basis of religion.

56. In refusing to accommodate Dr. D'Cunha's request for exemption because of her religious beliefs and firing her, Northwell discriminated against her on the basis of religion.

## COUNT 3
**Discrimination on the basis of perceived disability.**

57. Paragraphs 13-51 are incorporated herein.

58. The Americans with Disabilities Act, 42 U.S.C. 12101 prohibits discrimination on the basis of disability.

59. These protections include situations when the employee is "regarded as having such an impairment." 42 U.S.C. §12102(1)(c).

60. In refusing to accommodate Dr. D'Cunha's request for a medical exemption and firing her, Northwell discriminated against her on the basis of perceived disability—that, despite providing a laboratory-confirmed antibody count, she was impaired in her immunity to the disease, and is a carrier or potential carrier of an infectious disease.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

A.  Hold unlawful and set aside Northwell's vaccine mandate.

B.  Issue permanent injunctive relief enjoining Defendant Northwell and its agents from

failing to accommodate Dr. D'Cunha and terminating her and reinstate her to full employment status.

C.   Award compensatory and punitive damages to Dr. D'Cunha for loss of employment and costs incurred as a result of her loss of her residency, including losses related to the delay in the progress of her career.

D.   Award Plaintiff costs and reasonable attorneys' fees.

E.   Award such other and further relief as the Court deems equitable and just under the circumstances.

Dated: February 24, 2022

Respectfully Submitted,

_____
Counsel
E. Scott Lloyd
Law Office of E. Scott Lloyd, PLLC
Virginia Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
(540)631-4081
scott@law-esl.com
Counsel for the Plaintiff
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause a copy of the foregoing Complaint to be served upon Defendant on February 25, 2022.

_____

E.  SCOTT LLOYD

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Candice D'Cunha, declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2022.

_____

CANDICE D'CUNHA

10

**EXHIBIT A**




Northwell
Health™

**COVID-19 Vaccination – Religious Accommodation Request Form**

**Please complete this form to submit a request for a religious exemption from the New York State (NYS) COVID-19 Vaccination Requirement and submit it to your Site Human Resources Department no later than** September 3, 2021.

Name: Candice D'Cunha          Phone: ▓▓▓▓▓▓▓

Email: ▓▓▓▓▓@northwell.edu   Person ID Number: _____

Work Location/Facility: SIUH Herth & South   Job title: Resident Physician – PGY2

Department Name: Podiatry          Manager's name: Brigitte Mclaughlin

**Team Member Acknowledgment:**

By completing this form, I am requesting an accommodation in the form of an exemption from the NYS COVID-19 vaccination requirement because I have a genuine and sincere religious belief contrary to the practice of immunization. My objections to vaccinations are not based solely on grounds of personal philosophy or inconvenience." *"When the producers of the vaccines used for that immunization use tissue, cells, DNA or other organic materials derived from aborted human fetuses in the research,*
I understand that NYS requires all healthcare workers to receive their first COVID-19 vaccine by *development and/or* **September 27, 2021** and complete the vaccination series as outlined by the manufacturer and that my *production* request for an accommodation may be denied if it would create an undue hardship for Northwell *of that* Health, which includes but is not limited to an impairment to workplace safety or a burden to business *vaccine."* operations. I understand that if my accommodation request is denied, I will be required to become fully *CD* vaccinated to continue my employment at Northwell Health. *09/3/21*

Please describe the reason for your religious accommodation request, including a statement of how your particular sincerely-held religious belief, practice, or observance relates to your requested accommodation and why your requested accommodation is necessary. Please provide as much detail as possible, including any supporting documentation, that may be relevant to your request.

> I understand all of the foregoing to reference and to be in accord with current state and federal law regarding discrimination on the basis of religion, and reasonable accommodation of religious practice in the workplace. I do not, by signing this document, consent to any other standard other than the protections afforded to me under state and federal law, and I do not, by signing this document, agree to waive any protection against discrimination on the basis of religious belief, moral conviction, or any other protected status, nor do I waive any guarantee of equal protection, reasonable accommodation, or any other protection afforded to me

I understand that Northwell Health may request additional supporting documentation or information *under the* regarding my sincerely-held religious belief, practice, or observance. *law.* *CD* *09/3/21*



*All information provided as part of the accommodation request process will be kept as confidential as possible.*

**Please submit this completed form to your Site Human Resources Department.** Because of New York State's September 27 vaccine requirement for health care workers, team members will not be permitted to work beyond that date unless they are either vaccinated or have an approved exemption.

For that reason, we are strongly encouraging all team members to submit their forms no later than September 3. Any forms submitted after September 3 will still be reviewed, but in order to comply with the State's regulatory requirement, team members submitting forms after September 3 may be placed on unpaid administrative leave as of September 27th if they are unvaccinated and their request is still being reviewed on that date.

You will be contacted by a member of the Human Resources team to review your request and to advise if further information is required.  You will be notified if your request has been approved or not approved.

For questions about this process, please reach out to your Site Human Resources department.

**Team Member signature:** ████

**Date:** _____09 | 3 | 2021_____

I, Candice D'Cunha, request an exemption from the COVID-19 Northwell Health vaccine requirement. I am a lifelong practicing Roman Catholic, and my genuine and sincere religious beliefs are contrary to the practices which are herein required of me.

As a practicing Roman Catholic, I believe and my religion instructs me that abortion violates the very basic commands found in Exodus 20:13 and Deuteronomy 5:17 ("You shall not kill") which instructs us to not murder. All three vaccines currently available for the treatment of COVID-19 involve the use of cell lines derived from aborted fetuses.[1]

I also object to, and seek to avoid, all other vaccines which involve the practice of abortion either directly or indirectly. Supporting vaccinations and vaccination development involving aborted fetal cells is an endorsement of the sacrifice of those and the continuing sacrifice of other human souls. Genesis 4:1, 17 and Jeremiah 1:5 demonstrate that the deceased children used in the aforementioned vaccinations were recognized by God as human souls from the point of conception in the same way that we, as parents, recognized our child as a human from the moment we were aware of his/her presence in his/her mother's wombs.  Genesis 1:27 - 28, 4:1, 2 Kings 17:17-18, Psalm 22:10-11, 106: 35, 37-38, 113:7-9, 127:3, 139:13-16, Amos 1:13, Matthew 18:1-4, and Matthew 19:13-15 are just a few verses that illustrate the aforementioned children as blessings from God that are valued and loved by him, their Creator, in whose image they were created and that their killing is condemned and causes God's destructive anger to burn against their murderers and those complicit in those murders.  Exodus 20:13, Leviticus 18:21 & 20:2-5, Deuteronomy 5:13, 12:30-32, 18:10, 2 Kings 16:3, and Psalm 106:38 illustrate that all child sacrifice is condemned with no exception clauses allowing for the greater good or public exception clauses found anywhere in the sacred scriptures, Catholic Tradition, or the teaching authority of the Catholic Church. As the Catechism of the Catholic Church section 1782 states, "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his

---

[1] *See, e.g.*, Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, Newsweek, March 21, 2021, at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'"

Inasmuch as my sincerely held beliefs would be violated by taking a COVID vaccine for the aforementioned reasons, there is legal precedent that upholds and defends my right to Religious Exemption in this context. Therefore, I request that you uphold my genuine and sincerely held religious beliefs.

Sincerely,
Candice D'Cunha, DPM, PGY-2

**EXHIBIT B**

 **Northwell** Health·

## COVID-19 Vaccination – Medical Accommodation Request Form

**Please complete this form and provide the supporting medical documentation described on page 2 of this form to submit a request for a medical exemption from the New York State (NYS) COVID-19 Vaccination Requirement. Submit all forms and supporting documents to ehscompliance@northwell.edu no later than** _September 3, 2021_.

Name: Candice D'Cunha          Phone: ▮▮▮▮▮

Email: ▮▮▮▮ @northwell.edu.   Person ID Number: _____

Work Location/Facility: _____   Job Title: Resident Physician - PGY2

Department Name: Podiatry      Manager's name: Dr. Sottile

**Required Supporting Documentation:**

When returning this form, please include the required supporting medical documentation/information shown on page two (2). These documents must be provided and certified by a physician, physician assistant or nurse practitioner who is licensed to practice in the United States, and who is not related to you. For licensed practitioners, the certification may not be signed by yourself or a licensed practitioner from your practice. If this documentation is not provided upon initial submission, it will be requested prior to completing the review. Northwell Health may be unable to complete the review of an accommodation request if the required supporting medical documentation is not provided.

This request will be approved or denied after review by a Northwell Health clinical committee.

**Team Member Acknowledgment:**

By completing this form, I am requesting an accommodation in the form of a medical exemption from NYS COVID-19 Vaccination Requirement.

I understand that NYS requires all healthcare workers to receive their first dose of a COVID-19 vaccine by **September 27, 2021** and complete the vaccination series as outlined by the manufacturer and that my request for an accommodation may be denied if providing me a medical exemption would pose a direct threat to myself or others in the workplace or would create an undue hardship for Northwell Health. I understand that if the request is denied I will be required to become fully vaccinated to continue my _I understand all of the foregoing to reference and to be in_ employment at Northwell Health. _accord with current state and federal law regarding discrimination on the basis_ You will be notified if the exemption request has been approved or not approved. If approved, the _of pregnancy_ exemption will remain in effect for so long as your medical provider indicates that your health condition _and / or_ prevents you from receiving the COVID-19 vaccine and so long as the exemption continues to meet _disability,_ Northwell Health's criteria and standards for approval. You must also agree to adhere to all safety _and reasonable_ requirements set forth by Northwell Health for unvaccinated team members. _accommodation_
_of both in the_
For questions about this process, please reach out to your Site Human Resources department. _workplace._

_I do not, by_
Team Member signature: ▮▮▮▮▮            _signing this_
_document, consent_
Date: 9 | 9 | 2021            _to any other standard_
_other than the protections afforded to me_
_under state and federal law, and I do not,_
_by signing this document, agree to waive any_
_protection against discrimination on pregnancy,_
_disability, or any other protected status, nor do I waive any_
_guarantee of equal protection, reasonable accommodation, or any_
_other protection afforded to me under the law._ CD

v.1 – 8.18.2021

# Obstetrics and Gynecology at Staten Island

1145 Targee Street, Suite 2
Staten Island,NY 10304
(718) 979-5887

**Patient:** DCUNHA, CANDICE

Age/Sex/DOB:
EMRN:
OMRN:
Home:
Work:



---

## Results

| | | | |
|---|---|---|---|
| **Lab Accession #** | 5250409205 | **Collected:** | 08/03/2021  3:20:00PM |
| **Ordering Provider:** | LAPORTA, CHRISTOPHER | **Resulted:** | 08/04/2021  2:39:00AM |
| | | **Verified By:** | LAPORTA, CHRISTOPHER |
| **Performing Location:** | NSLIJ Core Lab (Med Director: Dwayne A. Breining M.D) | **Auto Verify:** | N |
| | 450 Lakeville Road | | |
| | Lake Success, NY 11042 | | |

**COVID-19 Spike Domain Antibody**     **Stage:**     **Final**

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| COVID-19 Spike Domain Antibody | >250.00 | U/mL | H | <=0.79 |

Roche ECLIA Total AB (GAM)
NOTE: This result index represents a total antibody measurement, which includes IgG, IgA and IgM.
Measures Receptor Binding Domain of the Spike Protein
Negative <= 0.79 U/mL
Positive  >= 0.80 U/mL

| | | | |
|---|---|---|---|
| COVID-19 Spike Domain Antibody Interpretation | Positive | | A  Negative |

This test has been authorized for emergency use by the FDA. Northwell Health Laboratories has validated this test to be accurate.
Results from antibody testing should not be used to inform infection status.
A positive result is consistent with vaccination, prior infection, or rarely be due to past or present infection with non-SARS-CoV-2
coronavirus strains, such as  coronavirus HKU1,  NL63, OC43, A3 or 229E.
A negative result does not rule out SARS-CoV-2 infection, particularly in those who have been in recent contact with the virus.



## Staten Island University Hospital
### Northwell Health·

Christopher LaPorta, MD
1145 Targee Street
Staten Island, NY 10304

To whom it may concern,

Candice Dcunha, DOB ███████ is currently under my care for current pregnancy EDC 3/6/22. She currently resides at 236 Graves Ave. S.I. 10314; Covid antibodies on 8/3/21 > 250. Request delaying vaccine administration to after delivery. I attest that I am not related to this patient. Thank you for your consideration in this matter.

Sincerely,

Dr. Christopher Laporta license # 199593

Christopher LaPorta, MD
1145 Targee Street
Staten Island, NY 10304

9/2/21

**Caruso, Milissa**

| | |
|---|---|
| **From:** | Dcunha, Candice |
| **Sent:** | Thursday, September 23, 2021 6:49 AM |
| **To:** | EHS Compliance |
| **Subject:** | medical exemption appeal |
| **Attachments:** | DCunha Doctor Letter (1).pdf; Antibody Test Range.pdf; Breastfeeding and vaccine.pdf |

Hello EHS,

I recently was in receipt of your rejection of my medical exemption request. I provided a letter from my Obstetrician regarding my current pregnancy. I also provided my antibody results test from having a prior covid infection earlier this year. As stated in my lab results, my antibody levels are at the maximum level they should be. Your decision to reject my medical exemption is extremely disappointing. I worked as a resident this past year while pregnant with my first child, and I contracted covid-19 three months postpartum, all while there was no effort made by the hospital for covid testing to ensure our safety. But now that a vaccine is available, we must test every week when the number of covid patients in-house are at its lowest. Please do explain.

At this time, after having received training in medicine, I am at a loss for how a level of antibodies that is at its maximum would benefit from a vaccine. How can something that is at its maximum range get any higher? Please do provide an explanation.

Research has shown that getting a vaccine is redundant for those who have already been infected with Covid-19 and have high antibody levels. I have some articles listed below for your reference:
https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2["Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination." "COVID-19 did not occur in anyone over the five months of the study among 2579 individuals previously infected with COVID-19"]
https://medicine.wustl.edu/news/good-news-mild-covid-19-induces-lasting-antibody-protection/ ["The findings, published May 24 in the journal Nature, suggest that mild cases of COVID-19 leave those infected with lasting antibody protection and that repeated bouts of illness are likely to be uncommon"]
https://www.nydailynews.com/coronavirus/ny-covid-delta-variant-pfizer-protection-past-case-20210827-kbyqgjpsyvc5rfzq6k4tdfejga-story.html["The largest real-world analysis comparing natural immunity and the protection provided by coronavirus vaccines revealed those who have received both jabs of Pfizer's two-stick shot were almost six-fold more likely to contract a delta infection and seven-fold more likely to show symptoms and become hospitalized than those who have already recovered from COVID"]

I have listed an article, and attached an article to this email with regards to lack in data specifically in pregnant women, lactating women, and their newborns: https://www.nih.gov/news-events/news-releases/nih-begins-study-covid-19-vaccination-during-pregnancy-postpartum ["Participants and their infants will be followed through the first year after delivery. To assess the development and durability of vaccine-induced antibodies overall and by vaccine type and vaccine platform, researchers will analyze blood samples collected from pregnant and postpartum participants."]

The final article I am attaching is regarding a preliminary study on pregnant women who have received the covid vaccine. https://www.nejm.org/doi/full/10.1056/nejmoa2104983 ["Among 827 participants who had a completed pregnancy, the pregnancy resulted in a live birth in 712 (86.1%), in a spontaneous abortion in 104 (12.6%), in stillbirth in 1 (0.1%), and in other outcomes (induced abortion and ectopic pregnancy) in 10 (1.2%)"]

Based on the above-mentioned studies, pregnancy seems like a strong contraindication to getting the vaccine.

Once again, I reiterate, by accepting a vaccine that I do not need due to natural immunity, I would be putting my unborn child at risk of death. I am not at risk of losing my child currently but getting the vaccine would put me at risk.

I am assuming there is a physician(s) reviewing my medical exemption request. You mentioned in your letter to me that my "stated reason for a medical exemption is not a contraindication to COVID-19 vaccination." This is a statement with inherent medical implications, made by unknown persons. Please do provide the name and license number of the physician assuming liability for myself and my unborn, developing child who is assuming there are no risks to either my unborn child or myself if I were to get the covid-19 vaccine.

I hope you will reconsider my appeal because at present you are forcing a pregnant mother to choose between the safety of her unborn child and her income and training. **I took care of your patients. Will you take care of your pregnant employee?**

I look forward to your response,
Candice D'Cunha, DPM, PGY2



Name: **CANDICE P DCUNHA DCUNHA**

Date of Birth: 

Gender Identity: Female

# Results

**Order:** COVID-19 Spike Domain Antibody

| Name | Date | Value | Units | Range | Source |
|------|------|-------|-------|-------|--------|
| COVIDSAB | 8/4/2021 | >250.00 | U/mL | <=0.79 | Northwell Health Clinic Labs |

**Notes:**

Roche ECLIA Total AB (GAM)
NOTE: This result index represents a total antibody
measurement, which includes IgG, IgA and IgM.
Measures Receptor Binding Domain of the Spike Protein
Negative <= 0.79 U/mL
Positive >= 0.80 U/mL

DISCLAIMER: This information is supplied from the patient's medical record via a patient portal. The medical provider is listed as the source. Items with a source of 'Patient-Entered' were added by the patient. This record may not be complete or up to date, and should not be used for providing medical advice. For an official copy of the

individual's medical record, the patient (or custodian) must contact their medical provider.



ACADEMY OF
**Breastfeeding Medicine**

Member Login    Search our site...

HOME    ABOUT    JOIN    DONATE    MEMBERS    MYABM    EVENTS    RESOURCES    ANNUAL MEETING

# ABM STATEMENT

## Considerations for COVID-19 Vaccination in Lactation

December 14, 2020 - Several countries have recently issued an emergency use authorization (EUA) for the Pfizer/BioNtech mRNA COVID-19 vaccine. A second mRNA COVID vaccine, manufactured by Moderna, will be reviewed in the coming weeks. Since these two vaccines are similar, the information in this document can be applied to both vaccines.

Although there is currently no clinical data on use of COVID-19 mRNA vaccines in lactation, the United States Food and Drug administration EUA left open the possibility of administering the vaccine to both pregnant and lactating individuals.

Many lactating individuals fall into categories prioritized for vaccination, such as front-line health care workers. The Academy of Breastfeeding Medicine does not recommend cessation of breastfeeding for individuals who are vaccinated against COVID-19. Individuals who are lactating should discuss the risks and benefits of vaccination with their health care provider, within the context of their risk of contracting COVID-19 and of developing severe disease. Health care providers should use shared decision making in discussing the benefits of the vaccine for preventing COVID-19 and its complications, the risks to mother and child of cessation of breastfeeding, and the biological plausibility of vaccine risks and benefits to the breastfed child.

These conversations are challenging, because the Pfizer/BioNtech vaccine trial excluded lactating individuals. As a result, there are no clinical data regarding the safety of this vaccine in nursing mothers. However, there is little biological plausibility that the vaccine will cause harm, and antibodies to SARS-CoV-2 in milk may protect the breastfeeding child.

The vaccine is made of lipid nanoparticles that contain mRNA for the SARS-CoV-2 spike protein; the mRNA sequence only encodes this protein. These particles are injected into muscle, where the nanoparticles are taken up by muscle cells. These muscle cells then transcribe the mRNA to produce spike protein. The spike protein made by the cell stimulates an immune response, protecting the individual from COVID-19 illness.

During lactation, it is unlikely that the vaccine lipid would enter the blood stream and reach breast tissue. If it does, it is even less likely that either the intact nanoparticle or mRNA transfer into milk. In the unlikely event that mRNA is present in milk, it would be expected to be digested by the child and would be unlikely to have any biological effects.

While there is little plausible risk for the child, there is a biologically plausible benefit. Antibodies and T-cells stimulated by the vaccine may passively transfer into milk. Following vaccination against other viruses, IgA antibodies are detectable in milk within 5 to 7 days. Antibodies transferred into milk may therefore protect the infant from infection with SARS-CoV-2.

Although the biology is reassuring, for definitive information, we will have to wait for data on outcomes once the vaccine is used in lactating individuals and their children.

According to the CDC Advisory Committee on Immunization Practices, with the exception of small pox and yellow fever, vaccines during lactation do not affect the safety of breastfeeding for the mother or her child.

The ABM urges vaccine manufacturers to include data for lactating individuals and their children in periodic safety reports. Furthermore, we strongly recommend that future research studies routinely include pregnant and lactating participants. We must protect pregnant and breastfeeding people through research, not from research.

Japanese Translation

## CONTACT US



© Copyright 2019 Academy of Breastfeeding Medicine. All rights reserved.

8735 W. Higgins Road, Suite 300 • Chicago, IL 60631

(800) 990.4ABM (USA toll free) • (847) 375.4726 (phone) • (847) 375.4713 Attn: ABM (fax)

Email: abm@bfmed.org

Privacy Policy

Back to top 



powered by  MemberClicks

**EXHIBIT C**



**Personal and Confidential**

September 20, 2021

Sent Via: Electronic Mail

Candice Dcunha
Email Address:███████@northwell.edu

**Re: Accommodation Status**

Dear Candice Dcunha:

We are in receipt of your request for a medical exemption from New York State's mandate that requires all personnel employed or affiliated with a health care facility to receive their first dose of the COVID-19 vaccine by September 27, 2021. In August 2021, the New York State Department of Health ("DOH") issued this vaccine mandate under Section 16 of the Public Health Law. After reviewing your request and supporting materials, we are unable to grant you a medical exemption from the NYS vaccine mandate. Exemption decisions are based on known COVID-19 vaccine safety risks. Your stated reason for a medical exemption is not a contraindication to COVID-19 vaccination. This means that in accordance with the NYS vaccination mandate, you must receive your first dose of the COVID-19 vaccine by September 27, 2021. If you feel as though your exemption decision was made without consideration of all available and/or relevant information, please submit such supplemental documentation to EHSCompliance@northwell.edu.

Although mask wearing and other existing protocols will continue to be required to help prevent the spread of the virus, these life-saving vaccines remain our best shot at crushing COVID-19. As healthcare professionals and members of the largest healthcare provider in New York State, we have a unique responsibility to get vaccinated to end the pandemic and protect our patients, colleagues, families and communities. If you have additional questions, please explore educational materials on the employee intranet, including FAQs, information sheets, recorded discussions and videos, some of which are available in multiple languages. Those without intranet access can also visit our digital vaccine hub for the community. Please reach out if we can provide you with any other information. Northwell is committed to providing you with the information you need to make this decision and can connect you with an expert. We urge you to get your first dose of the COVID-19 vaccine by September 27, 2021 to ensure you can help us continue to improve the health and quality of life of the communities we serve.

If you choose to not receive your first shot before September 27, 2021, you will be non-compliant with the NYS mandate and your continued employment will be at risk. In the meantime, we appreciate your cooperation with health and safety precautions to protect the health of you, your

176669 v.1

colleagues, our patients and visitors.  These precautions include the requirement to undergo weekly nasal PCR testing in accordance with Northwell's mandatory PCR testing program. Additionally, between now and September 27, 2021, you may be unable to participate in certain meetings, gatherings, and/or Northwell-sponsored events and programs due solely to your unvaccinated or partially vaccinated status.

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ███████████@northwell.edu to record your vaccination status.

Thank you,

Northwell Health Human Resources

CC: Site HRBP

**EXHIBIT D**



<u>**Personal and Confidential**</u>

September 29, 2021

Sent Via: Electronic Mail

**Re: Accommodation Status – Medical Exemption Request**

Dear Candice Dcunha:

You were previously informed that your request for a medical exemption from New York State's mandate that requires all personnel employed or affiliated with a health care facility to receive their first dose of the COVID-19 vaccine by September 27, 2021 was denied. Please be advised that after reviewing your resubmission of your request and supporting materials, if any, the initial determination on your request is unchanged and we are unable to grant you a medical exemption from the NYS vaccine mandate.  Exemption decisions are based on known COVID-19 vaccine safety risks. Your stated reason for a medical exemption is not a contraindication to COVID-19 vaccination. This means that in accordance with the NYS vaccination mandate, you were required to receive your first dose of the COVID-19 vaccine by September 27, 2021.

Although mask wearing and other existing protocols will continue to be required to help prevent the spread of the virus, these life-saving vaccines remain our best shot at crushing COVID-19.  As healthcare professionals and members of the largest healthcare provider in New York State, we have a unique responsibility to get vaccinated to end the pandemic and protect our patients, colleagues, families and communities.  If you have additional questions, please explore <u>educational materials</u> on the employee intranet, including FAQs, information sheets, recorded discussions and videos, some of which are available in multiple languages. Those without intranet access can also visit our <u>digital vaccine hub</u> for the community.  Please reach out if we can provide you with any other information.  Northwell is committed to providing you with the information you need to make this decision and can connect you with an expert.  We urge you to get your first dose of the COVID-19 vaccine to ensure you can help us continue to improve the health and quality of life of the communities we serve.

At this time you are noncompliant with the NYS mandate and your continued employment is now at risk.  We encourage you to get the vaccine immediately or you are risking your continued employment with Northwell.  In the meantime, we appreciate your cooperation with health and safety precautions to protect the health of you, your colleagues, our patients and visitors.  These precautions include the requirement to undergo weekly nasal PCR testing in accordance with Northwell's mandatory PCR testing program. Additionally, you may be unable to participate in certain meetings, gatherings, and/or Northwell-sponsored events and programs due solely to your unvaccinated or partially vaccinated status.

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ████████████@northwell.edu to record your vaccination status.

Thank you,

Northwell Health Human Resources

CC: Site HRBP

**EXHIBIT E**

**kate Rafla** ›

Thu, Sep 30, 12:05 PM

Hi Candace it's kate. Can you email me a copy of your exemption paperwork ASAP? And can you
Confirm which HR OFFICE You dealt with back in
August

Sure. I submitted it to the HR office on the 2nd floor by the cafeteria at SIUH north

What email address should I submit it to?

Krafla@northwell.edu

Thank you

Just emailed to you

Delivered

Thank you

iMessage

**EXHIBIT F**



**Personal and Confidential**

October 1, 2021

Sent Via: Electronic Mail

**Re: Accommodation Status**

Dear Dr. Candice Dcunha,

We are in receipt of your request for a religious exemption from the New York State vaccine mandate requiring health care workers to receive their first dose of a COVID-19 vaccine by September 27.  To the extent that you received an earlier communication from Northwell regarding your religious exemption request, including any prior denials, please disregard that earlier communication.

As you may be aware, the State revised its mandate on August 26 to limit exemptions to those that are medical in nature, thereby excluding any/all religious exemptions.  This meant that the State no longer permitted healthcare employers (including Northwell) from considering religious exemptions.  On September 14, a court granted a temporary order that placed a hold on the New York State Department of Health's ability to enforce its prohibition on religious exemptions.  At this time, it is unknown whether the court's temporary order will become permanent. While we understand your request for a religious exemption, and the rationale behind your request, we must also be mindful of the State's mandate as well as our operational concerns, including the safety of Northwell's patients, visitors and team members.

Therefore, in an effort to provide clarity to you while we await the court's final determination and in an effort to address operational concerns, Northwell has reviewed your religious exemption request in advance of the Court's ruling in the event that Northwell is ultimately permitted to consider such religious exemption.  In accord with the principles that would apply should such religious exemptions be permitted, we nevertheless have determined that your religious exemption request must be denied as it would create an undue hardship.  Specifically, we have determined that permitting you, as an unvaccinated team member, to report to your worksite that provides direct patient care and/or has direct contact with the general public poses an unacceptable health and safety threat to patients, co-workers, and visitors.  Moreover, there is no alternative arrangement that can be made that would allow you to perform the essential functions of your position while unvaccinated without creating an undue hardship.

As such, consistent with our requirements of all other Northwell employees, you are immediately required to receive a first dose of the COVID-19 vaccine as a condition of continued employment. Unless you take immediate steps to get your first dose, you will be considered non-compliant with the COVID-19 vaccine mandate.

177381 v.4

Please know that Northwell has a COVID-19 vaccine reserved for all team members. If you are interested in receiving a COVID-19 vaccine, you can book an appointment through the Employee Health Portal. If you opt to get vaccinated at a non-Northwell source, you can upload proof to the portal or email it to ███████████ @northwell.edu to record your new vaccination status.

Thank you,

Northwell Health
Human Resources

177381 v.4

**EXHIBIT G**

# Staten Island University Hospital
## Northwell Health·

September 28, 2021

Dcunha, Candice

████████████████

Dear Candice,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated.

As communicated to you numerous times over the past several weeks all Northwell team members were required to take steps to become compliant with the COVID-19 vaccine mandate for healthcare workers, or risk termination of employment for non-compliance. Because our records indicate that you have not taken any steps to receive your first dose of the vaccine as of today, September 28, 2021, today will be your last day of employment at Northwell Health.

Please note that if you make arrangements to receive your first dose of the vaccine in the near future we hope that you will seek to return to Northwell. In the event that you do receive the vaccine, please contact Mary Beth Springstead at ████████████ to understand what steps to take to pursue your reemployment with Northwell.

We wish you the best in your future endeavors.

Sincerely,

Brahim Ardolic, MD
Executive Director

Avenue | Staten Island, NY 10305 | Tel (718) 226-9000
Avenue | Staten Island, NY 10309
ter Plaza | Staten Island, NY 10305



# Staten Island University Hospital
## Northwell Health®

September 28, 2021

Dcunha, Candice
████████████████

Dear Candice,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated.

As communicated to you numerous times over the past several weeks all Northwell team members were required to take steps to become compliant with the COVID-19 vaccine mandate for healthcare workers, or risk termination of employment for non-compliance. Because our records indicate that you have not taken any steps to receive your first dose of the vaccine as of today, September 28, 2021, today will be your last day of employment at Northwell Health.

Please note that if you make arrangements to receive your first dose of the vaccine in the near future we hope that you will seek to return to Northwell. In the event that you do receive the vaccine, please contact Mary Beth Springstead at ████████ to understand what steps to take to pursue your reemployment with Northwell.

*10/1/2021*

We wish you the best in your future endeavors.

*LAst woRK dAy was 10/1/2021.*

Sincerely,

Brahim Ardolic, MD
Executive Director

475 Seaview Avenue  |  Staten Island, NY 10305  |  Tel (718) 226-9000
375 Seguine Avenue  |  Staten Island, NY 10309
One Edgewater Plaza  |  Staten Island, NY 10305

**EXHIBIT H**

 **Northwell**
Health·

October 5, 2021

<u>VIA EMAIL DELIVERY</u>

Candice D'Cunha, DPM



Dear Dr. D'Cunha,

Northwell Health has continued to underscore its obligation to lead by example in raising health for our patients and communities by ensuring that all of our team members become vaccinated against COVID-19. This obligation is all the more critical for Northwell physicians, such as yourself, who help model the standard for our entire organization.

As was communicated to you numerous times over the past several weeks, including as recently as earlier this week, all Northwell team members were required to receive the first dose of the COVID-19 vaccine by September 27. Because our records indicate that you have not taken steps to receive your first dose of the vaccine and your failure to do so jeopardizes the welfare of patients, other staff and the Northwell Health Training Program (the "Program"), this letter serves as notice of the termination of your employment and your contract for appointment as a member of the House Staff in the Program, effective October 7, 2021.

Upon receipt of this letter, you are encouraged to immediately schedule an appointment to receive the first dose of the vaccine and to provide satisfactory proof of vaccination to Employee Health Services prior to the termination date of October 7, 2021. Please upload your proof of vaccination to the <u>Employee Health Portal</u> or email it to ▮▮▮▮▮▮▮▮@northwell.edu. If you decline to be vaccinated and do not have a valid exemption, you may choose to resign your employment and contract by submitting a letter of resignation to your Program Director.

If you remain non-compliant with the vaccine mandate, your employment will be terminated as of October 7, 2021. In that event, you will receive a separate written notice regarding the termination of your employment and benefits, as well as your right to request a review of the termination as per the Office of Academic Affairs' Policies 7 and 7A on Due Process for Adverse Actions Taken Against Residents/Fellows.

Sincerely,

*Amy Duarte*

Amy Durante, MHA
Director, Medical Education

cc:   Human Resources Credentialing File: Candice D'Cunha
      John Sottile, DPM Podiatry Program Director

178425 v.1



# OFFICE OF ACADEMIC AFFAIRS

**POLICY # 7:   DUE PROCESS FOR ADVERSE ACTIONS TAKEN AGAINST RESIDENTS/FELLOWS**

**DATE REVISION APPROVED BY GMEC:  March 11, 2020**

---

**I.   <u>Purpose</u>**

    a.   The purpose of this policy is to establish institutional due process for the resolution of adverse actions taken against Trainees by their training programs or by the Institution.  Adverse actions are those actions that could result in a Trainee's intended career development.

    b.   The term Trainee in this policy includes all residents and clinical fellows in postgraduate medical education programs sponsored by Northwell Health (Northwell or Institution).

    c.   Remedial Action (remediation) for Trainees is not covered under this policy as it is not an adverse action.  Therefore, it cannot be challenged.

**II.   <u>Adverse Actions – Overview</u>**

    a.   If the Program Director determines, in consultation with the Department Chair and Office of Academic Affairs (OAA), that a Trainee's performance fails to meet required standards and/or the competencies and standards of the ACGME, AOA, CODA, and/or CPME, the Program Director may take one or more of the following actions ("Adverse Action"):

        1)   Impose a term of probation
        2)   Suspend or partially suspend the Trainee's participation in the program
        3)   Deny the Trainee credit for all or a portion of the academic year (as part of an Adverse Action.)
        4)   Deny renewal of the Trainee's contract
        5)   Dismiss the Trainee from the Program
        6)   Such other action as may be appropriate under the circumstances

    b.   An Adverse Action may be taken by the Program Director or the Department Chair, with regard to any Trainee who fails to comply with the provisions set forth in the

House Staff Manual, the Trainee's agreement with Northwell, Departmental policies or procedures, or any applicable laws, rules, and regulations.

c.      In determining which Adverse Action to take, the Program Director may consider factors such as the nature and severity of the circumstances giving rise to the need for an Adverse Action, the protentional impact on patient health or safety, the impact of the Trainee's conduct on the training program or the Institution, the likelihood that the situation can be successfully remediated, the degree of notice to the Trainee of Trainee's deficiencies and the opportunity to remedy same, and such other factors as the Program Director deems appropriate.

## III.   <u>ADVERSE ACTIONS</u>

### 1. Probation

a.      If the Program Director, in consultation with the Program's Clinical Competency Committee and Department Chair, determines that a Trainee's performance is unsatisfactory, the Program Director may place the Trainee on probation.

b.      Probation connotes a process of intensified evaluation, education and monitoring.

c.      The Program Director must give the Trainee written notice of probationary status prepared on the Probation Form, which must include the duration of probation, the specific actions or deficiencies that led to the imposition of probation, a plan to remedy the identified deficiencies, and methods and frequency of performance evaluation during the probationary period.  A copy of the Probation Form must be forwarded to the OAA.

d.      At the end of the probationary period, the Program Director must notify the Trainee in writing whether the Trainee:

1)  was successful in meeting the terms of the probation and will remain in the program

2)  was not fully successful in meeting the terms of the probation and will remain on probation;

3)  was unsuccessful in meeting the terms of the probation and will be dismissed from the program;

4)  requires additional or different action.

e.      Probation may be required to be reported to future employers or licensing and administrative agencies.

### 2. Suspension or Partial Suspension:

a.      If at any time the actions of Trainees present a threat to themselves or a threat to the welfare or safety of patients, staff or others or to the integrity of the program or Institution, the Program Director, in consultation with the Department Chair, may immediately prohibit a Trainee from participation in all aspects of the training

program ("Suspension").  Academic credit will not be given to a Trainee during the suspension period.

b.  Depending on the severity of the circumstances, a Program Director may also decide to restrict the Trainee's participation to certain clinical and/or academic activities ("Partial Suspension").  The amount of academic credit to be awarded to a Trainee during a period of Partial Suspension is at the discretion of the Program Director.

c.  The Trainee must be given notice of such Suspension, or Partial Suspension, and the reasons therefor verbally with written notice to be provided to the Trainee as soon as practicable under the circumstances.

d.  At the end of the Suspension or Partial Suspension, the Program Director must notify the Trainee in writing as to what further action is to be taken.

e.  A Suspension, or Partial Suspension, may be required to be reported to future employers or licensing and administrative agencies.

***If a Trainee is suspected of conduct that poses an immediate threat to the safety or welfare of patients, staff or others or to the integrity of the program or Institution, a Trainee may be suspended while such allegations are investigated ("Investigatory Suspension").  If after investigation the allegation(s) are found to be unsubstantiated, a letter will be placed in the Trainee's file by the Program Director documenting the investigatory findings.  An Investigatory Suspension is not considered an Adverse Action for the purpose of this Policy and may not be challenged.***

f.  Extended time away from residency activities during any of the Adverse Actions listed above may need to be made up at the discretion of the Program Director.

**3.  Denial of Academic Credit**

a.  If a Trainee does not satisfactorily complete a probationary period, fails to make up work missed during a suspension, or has otherwise failed to make sufficient academic progress to be advanced to the next training level, the Program Director, in consultation with the Clinical Competency Committee, and Department Chair may require the Trainee to repeat all or part of the academic year's work.

b.  If a Trainees is dismissed before the completion of the Trainee's academic year, the Program Director will determine the number of months of credit to be given the Trainee for that academic year.

c.  Denial of credit may be required to be reported to future training programs, employers, or licensing and administrative agencies.

**4.  Non-Renewal/Dismissal**

a.  A Trainee may be dismissed from the program or be denied a renewal contract for the next academic year, if the Trainee has failed to meet accepted academic, clinical and/or professional standards, or the Trainee has engaged.  In conduct that threatens

the welfare or safety of patients, staff or others or the integrity of the training program or the Institution.

**b.**   The decision to dismiss a Trainee or not to provide a Trainee with a renewal contract will be made by the Program Director, in consultation with the Department Chair and the Clinical Competency Committee.   No later than four months prior to any dismissal or non-renewal of the Trainee's contract, the Program Director must provide the Trainee with written notice of the decision to dismiss or not to renew, stating the reasons therefor.   However, if the primary reason for dismissal or non-renewal occurs within the four months prior to the end of the Trainee's contract, then the Program Director must provide the Trainee with written notice of the decision as soon as the circumstances will reasonably allow.

**c.**   The dismissal or non-renewal may be reported to future training programs, employers, or licensing and administrative agencies.

**5.   Notice and Appeal Procedure**

**a.**   Whenever a Program Director in consultation with the Department Chair and Clinical Competency Committee contemplates taking any of the Adverse Actions listed above, he/she will notify the Office of Academic Affairs (OAA) of the potential action and the facts upon which it is based.

**b.**   When a Trainee is subject to any of the Adverse Actions described above, as soon as practicable the Trainee must be given written notification of the Adverse Action from the Program Director with a copy to the OAA.   This notice must include the circumstances which gave rise to the Adverse Action, the duration of the action, and any conditions imposed for resuming participation in the training program ("Advserse Action Notice") and will be accompanied by a copy of the Policy.   The Trainee may challenge the Adverse Action by requesting that an ad hoc committee be convened to review the action taken.   Such request must be made in writing to the OAA within seven (7) business days of the Trainee's receipt of the Adverse Action Notice.

**c.**   Upon receipt of a Trainee's timely request for a review, the OAA must appoint an Adverse Action Review Committee ("Committee") to review the Adverse Action (The "Review").   The Committee will consist of a Resident or Fellow selected by the Resident Forum or the House Staff Association, as applicable, and two attending physicians, one of whom will serve as the Chair of the Committee ("Committee Chair").   None of the Committee members, including the Resident/Fellow representative, may be a member of the affected Trainee's department.   The OAA must notify the Program Director and the affected Trainee in writing of the time, date, and place of Review ("Notice of Review") and both parties are expected to appear before the Committee to discuss their position on the Adverse Action taken. The Review will take place within thirty (30) business days from the date that the Trainee receives the Notice of Review.

d.   If the Adverse Action is a suspension, termination or non-renewal, the Review may be accelerated upon the request of the affected Trainee, to take place on a date that is more than fifteen (15) days, but less than thirty (30) days from the date the OAA receives the request.

e.   The Review must be held in accordance with the procedures set forth herein and in "Policy #7A Adverse Action Review and Appeal Rules and Regulations" ("Rules and Regulations")

f.   Following the conclusion of all fact finding the Committee may accept, reject or modify the Adverse Action taken, or take any other action that the Committee deems appropriate under the circumstances.   The action the Committee takes and the supporting reasons must be in writing ("Report")

g.   No later than 15 days following the conclusion of the Review, a copy of the Report must be sent to the affected Trainee and the Program Director.  If, after receipt of the Report, either the Trainee or Program Director wishes to challenge the Committee's decision, either party must submit its request for an appeal, and the reasons therefor, in writing to the OAA within seven (7) days of receipt of the Report.  If neither party submits a timely request for appeal, the decision of the Committee will be final and binding upon all parties.

As soon as practicable following receipt of a request for an appeal, the Chief Academic Officer ("CAO") will receive the Trainee's record, the basis for the Adverse Action and the Report.  The CAO may request and consider any additional information the CAO deems necessary and must conduct the appeal pursuant to the procedures set forth in the Rules and Regulations.  Within 15 days of the CAO's receipt of the record the CAO will notify the Trainee, the Program Director, and the OAA of the CAO's decision in writing.  The decision of the CAO will be final and binding upon all parties.  It will be the responsibility of the OAA to advise the Graduate Medical Education Committee upon ultimate disposition of each Adverse Action.



**Northwell**
Health™

**POLICY #7A:  ADVERSE ACTION REVIEW AND APPEAL RULES AND REGULATIONS**

**DATE REVISION APPROVED BY GMEC:       March 11, 2020**

---

### I.       Purpose

The purpose of this policy is to establish rules and regulations governing the review and appeal of Adverse Actions, as that term is defined in  Policy  #7: Due Process For Adverse Actions Taken Against Resident/Fellows ("Due Process Policy")1.

### II.      Procedures

Except  as provided  in  the Due Process Policy,  the procedures  set forth  below   will apply whenever a Trainee  requests  a  Review  to challenge  an Adverse Action  or when  the Program or Trainee  requests  an appeal of the Committee's  decision.

#### A.  Review

1.  In connection with the Review,  the  Committee  must  offer  the opportunity for the Trainee to appear; any trainee who refuses to cooperate and/or appear at the scheduled review will be deemed  to have  waived  his  or her right  under  this policy.

2.  The Committee will meet with the Trainee and Program Director to hear evidence and\or witness  testimony  in  support  of the Trainee  and Program Director's  positions.   The Review  is  not  considered  a formal  hearing   and therefore is not subject to any formal rules  of evidence   or procedure.   The  introduction   of any relevant   information, including  witnesses, will  be determined by the  Committee  Chair.

3.  The  Trainee  may be represented  by counsel  at the Review.  If the  Trainee intends to have such legal representation, the Trainee must  notify  the  OAA in writing no later than five (5) business days after  submitting  his/her request for a Review. If the Trainee is to be represented by counsel, then the Program  and the  Committee   may also be represented by counsel,  provided that counsel representing the  Program  cannot  be the  same  counsel representing the Committee. If the  Trainee  elects  not  to have  an attorney present at the Review, neither the Program nor the Committee will have legal representation.   The  primary  role  of all  attorneys  present  during  the Review will be limited to providing advice to their clients. Counsel  may make   evidentiary and/or procedural  objections,  which  will  be ruled  upon  by the Committee  Chair  based on common  sense  and fairness,  but counsel  will  not be permitted  to make opening or closing statements or examine or cross- examine  witnesses.

*1 All capitalized terms herein will have the meaning ascribed to such terms in the Due Process Policy.70236 v3*

4. The Trainee and the Program will be given the opportunity to make an opening statement. After opening statements have concluded, the Program will be permitted to present its case-in-chief by describing the Adverse Action taken and the bases therefor, which it may do through the use of documentary and/or testimonial evidence.

5. After the Program has presented its case-in-chief, the Trainee will present his/her case-in-chief. To reverse the Adverse Action the Trainee has the burden to persuade the Committee that the Trainee failed to receive notice of his/her deficiencies in the ACGME Core Competencies and a

6. reasonable opportunity to remedy same; or that the Adverse Action lacks any factual basis or is not in compliance with ACGME, CODA, CPME or Northwell policies, including those contained in the house staff manual. The Trainee may meet this burden via documentary and/or testimonial evidence.

7. All participants at the Review will be afforded a reasonable opportunity to present their case through the presentation of documents and witnesses. At the discretion of the Committee Chair after each party has presented his/her case in chief, the parties may be provided the opportunity to rebut any testimony or document presented.

8. A record of the Review will be made by a court reporter who will be present during the entirety of the Review proceeding. Each party is responsible for possessing sufficient copies of all documents to be presented during the Review for all Committee members, the opposing party and his/her counsel, and the court reporter.

9. The Review will not be open to the public and no individuals other than the Committee members, the parties and their counsel, and any relevant witnesses will be permitted to attend. All documents and testimony presented at the Review must be maintained in strict confidence.

**B.    Appeal**

1. Upon the CAO's review of the record below, which will include the Trainee's file, the basis for the Adverse Action, a l documents presented during the Review, the transcript of the Review, and the Committee's Report of its decision ("Record"), the CAO will determine the need for any additional documents or testimony from the parties.

2. If the CAO decides to permit oral argument by the parties, such argument will be limited only to those issues presented during the Review. The CAO will not consider any new arguments or witness testimony. In lieu of oral argument, the CAO may request a writing from the parties to clarify any issues raised during the Review. If the CAO makes such a request, both parties will be provided with the opportunity to provide such writing simultaneously. No reply statements will be permitted by either party. To the extent any party wishes to provide additional written evidence, absent a request from the CAO, the CAO retains sole discretion to accept such writing, provided that the party seeking to provide such evidence can show that such writing is directly related to the issues presented at the Review, and such information was not available at the time of the Review or could not have been presented due to circumstances that could not have been anticipated in the exercise of reasonable diligence.

3. In rendering a decision on appeal, the CAO retains sole discretion to base such decision solely on review of the Record, without oral argument or writings from the parties.

4. To reverse the Committee's decision, the party requesting the appeal has the burden of persuading the CAO that the Committee's decision lacked a factual basis or could not have reasonably been made given the burden of the prevailing party.

5. The CAO may affirm, modify, or reverse the Committee's decision or remand the matter to the Committee for reconsideration.

**EXHIBIT II**



**Northwell**
Health·

October 7, 2021

<u>VIA HAND DELIVERY</u>
Candice D'Cunha, DPM

████████████████████████████

Re:  Notice of Adverse Action

Dear Dr. D'Cunha,

This letter provides you formal notice of the decision of the Program Director in consultation with executive leadership of Staten Island University Hospital/Northwell Health to dismiss you from the Northwell Health Training Program – SIUH – Podiatric Medicine and Surgery, Reconstructive Rearfoot & Ankle (the "Program"), effective immediately ("Adverse Action").  This notice is provided in accordance with the Graduate Medical Education Office of Academic Affairs' Policy #7: *Due Process Policy for Adverse Actions Taken Against Residents/Fellows*. Your employment agreement with Northwell Health is also terminated as of this date.

As you know, you were advised by letter dated October 5, 2021 that your employment and contract for participation in the Program would be terminated in the event that you continued to be non-compliant with Northwell Health's mandate that all team members receive the first dose of the COVID-19 vaccine by September 27.  Our records indicate you have not taken steps to receive your first dose of the vaccine in violation of this mandate and applicable New York State laws, rules, and regulations.  By the foregoing conduct, the Program has determined that your continued participation in the Program would jeopardize the welfare of patients, other staff, and/or the Program.

Pursuant to the *Due Process Policy for Adverse Actions Taken Against Residents/Fellows* (a copy of which is enclosed, along with a copy of Policy #7A: *Adverse Action Review and Appeal Rules and Regulations*), you may request that an *ad hoc* committee be convened to review this Adverse Action by submitting a written request to the Office of Academic Affairs ("OAA") within 7 business days of your receipt of this notice.

Sincerely,

*[signature]* . DPM

Program Director

cc:  Office of Academic Affairs and Human Resources

178923 v.2

**EXHIBIT J**

PROCEEDINGS - November 22, 2021

```
 1   _____

 2   In the Matter of

 3   THE ADVERSE ACTION REVIEW MEETING BETWEEN

 4   CANDICE D'CUNHA, DPM

 5
         - and -
 6

 7   NORTHWELL HEALTH, INC.

 8   _____

 9                     November 22, 2021
                       9:05 a.m.
10
                       Held remotely via Zoom
11

12

13   BEFORE:        STEPHEN BARONE, M.D.
                    REBECCA ZWEIFLER, M.D.
14                  SUZANNE EL-SAYEGH, M.D.

15
     ALSO PRESENT:  JOHN SOTTILE, M.D.
16                  WILLIAM LOWE, M.D.
                    TAMIRA BRUNSON, Northwell Health
17                  GUS PHILLIPS, Gregory Edwards

18

19

20   REPORTED BY:   MICHELLE CONERO, Court Reporter

21

22
```

PROCEEDINGS - November 22, 2021

Page 2

```
 1                    E X H I B I T S

 2

 3        PROGRAM
          EXHIBIT NO.     DESCRIPTION              PAGE
 4
            1       10 NYCRR 2.61, Prevention      Premarked
 5                  of COVID-19 Transmission
                    by Covered Entities
 6
            2       Human Resources Policy and     Premarked
 7                  Procedure Manual

 8          3       COVID-19 vaccination -         Premarked
                    medical accommodation
 9                  request form

10          4       9/20/21 e-mail to Candice      Premarked
                    D'Cunha and 9/29/21 e-mail
11                  to Candice D'Cunha

12          5       COVID-19 vaccine update from   Premarked
                    Northwell Health dated
13                  between 8/2/21 and 10/4/21

14          6       COVID-19 vaccination -         Premarked
                    religious accommodation
15                  request form

16          7       10/1/21 e-mail to Candice      Premarked
                    D'Cunha
17
            8       1/21 letter to Candice         Premarked
18                  D'Cunha

19          9       2020/2021 Resident/Fellow      Premarked
                    Manual
20
           10       Northwell Health              Premarked
21                  documentation

22
```

PROCEEDINGS - November 22, 2021

Page 3

1     EXHIBITS (CONT.):

2


3        PROGRAM
         EXHIBIT NO.          DESCRIPTION              PAGE
4
         11          10/5/21 e-mail to Candice      Premarked
5                    D'Cunha

6        12          10/7/21 e-mail to Candice      Premarked
                     D'Cunha
7
         13          10/8/21 termination            Premarked
8                    acknowledgement

9        14          10/11/21 e-mail to Amy         Premarked
                     Durante from Candice D'Cunha
10
         15          11/4/21 e-mail to Candice      Premarked
11                   D'Cunha

12

13

14

15

16

17

18

19

20

21

22

PROCEEDINGS - November 22, 2021

1         DR. BARONE:  William, good morning.

2    Can you introduce yourself?  Are you going

3    to be a witness?

4         MR. LOWE:  Yes.  My name is William

5    Lowe, I'm the medical director for the

6    Employee Health Service.  I am a witness for

7    today.

8         DR. BARONE:  Okay.  So I'm going to

9    ask, I guess, Gus, can you put him in a

10   holding room for the beginning of the

11   presentation until it's time for him to be a

12   witness?

13        MR. PHILLIPS:  Yes.

14        And is it Dr. William Lowe?

15        MR. LOWE:  Yes.

16        DR. BARONE:  Tamira, can you please

17   tell me your role?

18        MS. BRUNSON:  I'm the paralegal.  I'm

19   presenting the exhibits on the screen for

20   the hospital.  I've also been controlling

21   the screen to share the confidentiality

22   statement.

PROCEEDINGS - November 22, 2021

1           DR. BARONE:  Okay.  So your major role

2      here is to just help present any of the data

3      that we have to show?

4           MS. BRUNSON:  Correct.

5           DR. BARONE:  Okay, good.  And

6      Michelle, can you introduce yourself?  Ms.

7      Conero.

8           MS. CONERO:  Sure.  Good morning,

9      everybody.  I'm the court reporter.  I will

10     be taking down everything that is said

11     today.

12          DR. BARONE:  Okay.  I'm going to start

13     and read an opening statement.

14          MR. PHILLIPS:  Counsel -- Mr. Barone,

15     Candice, I just wanted to make sure I had

16     your name.  Is it Dr. Candice --

17          DR. D'CUNHA:  Yes.

18          MR. PHILLIPS:  What would your last

19     name be?  I just wanted to change it on the

20     screen.

21          DR. D'CUNHA:  It's D-'-C-U-N-H-A.

22          MR. PHILLIPS:  Thank you.

PROCEEDINGS - November 22, 2021

Page 6

1              MS. EL-SAYEGH:  Dr. Barone, who is the

2     final person in the room?  Dr. Sottile?

3              DR. BARONE:  He's the program

4     director.

5              DR. SOTTILE:  I'm the program director

6     for the podiatric residency program.

7              DR. BARONE:  This is an opening

8     statement regarding the Adverse Action of

9     the Review Committee meeting with Candice

10    D'Cunha.

11             Am I pronouncing it right, Candice?

12             DR. D'CUNHA:  Correct.

13             DR. BARONE:  I would like to call the

14    meeting to order.  My name is Dr. Stephen

15    Barone and I am the program director of

16    Pediatrics at Cohen's Children's Medical

17    Center at Northwell.  We're here to review

18    the adverse action imposed with respect to

19    Dr. Candice D'Cunha, specifically the

20    decision to terminate her from the Podiatric

21    Medical and Surgical Reconstructive Rear

22    Foot and Ankle program at Staten Island

PROCEEDINGS - November 22, 2021

```
 1          University Hospital, which I will refer to
 2          as the program.
 3                 I'm serving as the chair of the
 4          Adverse Action Committee.  I would like to
 5          take a moment to review the procedures for
 6          this morning's meeting.  This review is
 7          being held in accordance with procedures set
 8          forth in policies number 7 and 7-A of the
 9          Office of Academic Affairs.  Each party will
10          be provided the opportunity to make an
11          opening statement.  John Sottile, the
12          director of Podiatric Medicine and Surgery
13          at the hospital, is also the program
14          director.  Dr. Sottile will open the meeting
15          with a statement on behalf of the program.
16                 Dr. D'Cunha, you'll make your
17          opening statement once Dr. Sottile has
18          completed his.
19                 After opening statements have
20          concluded, the program will present its case
21          by describing the adverse action imposed
22          against Dr. D'Cunha and the reasons
```

PROCEEDINGS - November 22, 2021

Page 8

1            supporting such action, which can be made

2            through the use of documentary evidence or

3            witness testimony.   In order to reverse the

4            adverse action Dr. D'Cunha has the burden to

5            persuade the committee that she failed to

6            receive notice of any deficiency in ACGME

7            core competencies and a reasonable

8            opportunity to remedy same, or that the

9            adverse action lacks any factual basis or is

10           not compliant with ACGME, CODA, CPME or

11           Northwell policies, including those

12           contained in the house staff manual.   Dr.

13           D'Cunha may meet this burden by way of

14           documentary or testimonial evidence.   This

15           meeting is not subject to any formal rules

16           of evidence or procedure, and the committee

17           will permit presentation of evidence and

18           witnesses subject to any restrictions we may

19           impose.   On behalf of the committee I will

20           make all the rulings with respect to whether

21           the proposed evidence and witnesses are

22           relevant to this review.

PROCEEDINGS — November 22, 2021

1            I am going to ask the other two

2       members of the committee to give their name,

3       department and position.  So you guys want

4       to go ahead.

5            DR. EL-SAYEGH:  Dr. Suzanne El-Sayegh.

6       I'm the program director of Internal

7       Medicine at Staten Island University

8       Hospital Northwell, and I'm an associate

9       chairman of Medicine.

10           DR. ZWEIFLER:  I'm Dr. Rebecca

11      Zweifler, I'm a third-year internal medicine

12      resident at Lenox Hill Hospital.

13           DR. BARONE:  The record should reflect

14      that no one on this committee is a member of

15      the Department of Podiatric Medical Surgery

16      at the hospital.

17           Dr. D'Cunha has elected to proceed

18      without an attorney.  As a result, pursuant

19      to policy 7-A, neither the program nor the

20      committee will have an attorney present.

21           There is a court reporter here today,

22      we introduced her, and a transcript of this

PROCEEDINGS - November 22, 2021

1           meeting will be made.  All parties and

2           witnesses should be sure to speak clearly

3           and give only verbal responses so the court

4           reporter may accurately transcribe the

5           testimony provided during the meeting.

6                This review is not open to the public.

7           All the documents and testimony present here

8           shall be maintained in strict confidence.

9                As chairperson I'll preside over the

10          meeting and maintain decorum and order.

11          I'll ensure that all participants are

12          offered a reasonable opportunity to present

13          their case.

14               I will act on objections and requests

15          for rulings based on common sense and

16          fairness.

17               Of course this is a confidential

18          proceeding.  Nothing occurring during this

19          meeting should be discussed outside the

20          room.  All documents presented to each party

21          will be confidential.

22               The committee may accept, reject or

PROCEEDINGS - November 22, 2021

```
 1          modify the adverse action taken or take any

 2          other action the committee deems appropriate

 3          under the circumstances.  The action taken

 4          by the committee and the supporting reasons

 5          will be set forth within in a written report

 6          within 15 days of inclusion and review.

 7          Because the transcript of this meeting will

 8          be of great assistance to the committee in

 9          its deliberations, we ask the program and

10          Dr. D'Cunha to agree that the review is

11          deemed concluded -- is not deem concluded

12          until after the committee receives the

13          transcript.

14               Is that okay with you, Dr. Sottile?

15               DR. SOTTILE:  Yes.

16               DR. BARONE:  Is that okay with you,

17          Dr. D'Cunha?

18               DR. D'CUNHA:  Yes.

19               DR. BARONE:  Thank you.

20               Unless there are any other matters

21          anyone would like to raise at the time, I

22          would ask the program to proceed.
```

PROCEEDINGS - November 22, 2021

1               Before I let Dr. Sottile make an

2         opening statement, any other questions or

3         concerns?

4               (No response.)

5               DR. BARONE:  Please speak clearly and

6         at least at a reasonable pace so Michelle

7         can get everything down.

8               Okay.  Go, Dr. Sottile.

9               DR. SOTTILE:  Good morning.  My name

10        is Dr. John Sottile and I am the program

11        director at Staten Island University

12        Hospital for the Podiatric Medical and

13        Surgical Residency Program.  I will refer to

14        that program as program if needed as I

15        continue my opening statement.

16              I was the program director to Dr.

17        Candice D'Cunha whose termination we are

18        here to review.  Dr. D'Cunha became a

19        resident in the program beginning in June

20        2020.  In the summer of 2021 New York State

21        issued a mandate requiring that all

22        healthcare workers receive the COVID-19

PROCEEDINGS - November 22, 2021

1              vaccine by September 27, 2021.   Northwell

2              also mandated that its team members receive

3              the COVID-19 vaccine by that same date.

4                   You will hear about the mandate from

5              Dr. William Lowe who is a medical director

6              for Northwell's Employee Health Service,

7              also known as EHS.

8                   As a resident in the program, an

9              employee of Northwell, Dr. D'Cunha was

10             required to follow and comply with all

11             applicable laws, rules, regulations and all

12             Northwell policies.   Dr. D'Cunha chose not

13             to be vaccinated.   As the other residents in

14             the program were being vaccinated in order

15             to comply with the mandate, I learned that

16             Dr. D'Cunha had not yet been vaccinated.   I

17             asked her and she said no.   I recommended

18             that she discuss it with her husband and her

19             OB/GYN.   The next time we discussed it she

20             said that she had discussed it with her

21             family and her OB but she still did not want

22             to be vaccinated.   She indicated that she

PROCEEDINGS - November 22, 2021

```
 1          would seek a medical and religious
 2          exemption.  We did not discuss the details
 3          of what those requests might be.  You will
 4          hear from Dr. Lowe about her medical
 5          exemption request and from Vicki Kahaner,
 6          who is vice president of Employee Relations,
 7          about her religious exemption request.
 8          Those requests were denied.  Without an
 9          approved exemption, Dr. D'Cunha needed to
10          get vacc'd.
11              On October 5, 2021 she was given a
12          letter stating that she was out of
13          compliance with the requirement that she be
14          vaccinated by September 27th. The letter
15          offered her a way to schedule the vaccine so
16          she could comply, and further stated if she
17          did not get vaccinated she would be
18          terminated on October 7, 2021.  She did not
19          get vaccinated.  By the letter dated
20          October 7, 2021 she was given notice of this
21          adverse action, namely that she was being
22          terminated for her failure to comply with
```

PROCEEDINGS - November 22, 2021

1          the vaccine mandate.

2                We discussed it again at that time but

3          there was nothing much more to say.  Her

4          request for this review will follow.

5                Candice will be given an opportunity

6          to make her statement and then, as I

7          mentioned, Dr. Lowe and Ms. Kahaner will

8          address the nature of her request for

9          exemptions from the vaccine mandate.  If

10         needed, we will discuss a timeline which we

11         have prepared and documents included in that

12         timeline.

13               Thank you.

14               DR. BARONE:  Thank you.  Dr. D'Cunha,

15         would you like to make an opening statement?

16               DR. D'CUNHA:  Just to verify here.  I

17         have the reasons for why I did want to ask

18         for an appeal.  I also have a longer

19         testimonial of what I really do want to say.

20         Does that come at a later time and then I

21         just make this opening appeal request first?

22               DR. BARONE:  You can make an opening

PROCEEDINGS - November 22, 2021

1          statement now.  I mean later we may ask if

2          you want to present any documents or

3          evidence.  If you want to make an opening

4          statement, you can do it now.

5                 DR. D'CUNHA:  This is going to be a

6          few minutes.  So the reason for the appeal

7          today from my standpoint is that there is no

8          rational basis for me to be vaccinated while

9          I'm pregnant.  The safety of the vaccine for

10         pregnant woman has not been established.

11         There are studies indicating that there

12         could be some cause for concern for pregnant

13         women.  My history of having COVID and the

14         antibody test I provided both indicate that

15         I have obtained natural immunity.

16               The failure of Northwell to

17         accommodate me based on my pregnancy

18         violates the Pregnancy Discrimination Act.

19         The failure of Northwell to accommodate me

20         based on my religious objection violates the

21         Civil Rights Act of 1964.  And then the

22         termination by Northwell solely based on my

PROCEEDINGS - November 22, 2021

1          COVID vaccination status over and above all

2          considerations of performance, ability and

3          exclusive of any attempt to provide

4          reasonable accommodations consistent with

5          Northwell's practices up until a few months

6          ago, including the use of PPE, social

7          distancing and other measures, is

8          inconsistent with the concept of due process

9          which acknowledges the rights and the unique

10         circumstances of individuals.

11              In 1927 a Supreme Court case, Buck

12         versus Bell, Superintendent of State Colony

13         Epileptics and Feeble Minded, concluded that

14         it was acceptable for the Commonwealth of

15         Virginia to sterilize Carrie Buck, who was

16         deemed to be feeble minded, without her

17         consent.  Such an operation did not violate

18         the Fourteenth Amendment guarantees of equal

19         protection and due process of law according

20         to the court.  In the process of ruling that

21         it did not, Supreme Court Justice Oliver

22         Wendell Holmes stated it is better for all

PROCEEDINGS - November 22, 2021

Page 18

1          the world if instead of waiting to execute

2          degenerate offspring for crime, or to let

3          them starve from their imbecility, society

4          can prevent those who are manifestly unfit

5          from continuing their kind.  The principle

6          that sustains compulsory vaccination is

7          broad enough to cover cutting the fallopian

8          tube.  Three generations of imbeciles are

9          enough.  Justice Holmes was not speaking for

10         a lunatic fringe.  He was writing for eight

11         of nine Supreme Court justices. He was also

12         speaking for a scientific establishment that

13         had, to a large degree, accepted the

14         principle of eugenics in the service of

15         racial purity.  That same principle was also

16         taking hold in Germany and gave way to the

17         scourge of Naziism.

18              Just to clarify here in case anyone

19         was lacking this information, Carrie Buck

20         was a woman who was raped by her foster

21         parents' nephew.  She was not someone who

22         was feeble of mind.  They were simply trying

PROCEEDINGS - November 22, 2021

1        to hide her from society because she got

2        pregnant as a result of the rape.  She was

3        not informed that she ever was to be

4        sterilized.  She only found that out years

5        later.  Five years later, in 1932, the

6        United States Public Health Service

7        commenced a study about the ravages of

8        untreated syphilis in black men in Tuskegee,

9        Alabama.  Over a period of 40 years the U.S.

10       Government doctors withheld treatment,

11       including penicillin, to roughly 200 black

12       men in an episode that has become one of the

13       most infamous in U.S. history.

14            When the story of the testing

15       experiments broke in 1972, Dr. J.D. Millar,

16       head of the Venereal Disease branch of the

17       CDC, stated the study began when attitudes

18       were much different on treatment and

19       experimentation.  At this point in time,

20       with the knowledge of treatment and the

21       disease and the revolutionary change in

22       approach to human experimentation, I don't

1        believe the program would be undertaken is

2        what he said.

3            When the story broke in 1972, an ad

4        hoc advisory panel was put together to

5        review the study.  The men were never

6        offered or told that the research was

7        voluntary.  They were never told that they

8        could back out of the program.  They were

9        never told when treatment was made

10       available.  The revolution that he was

11       speaking of, which was borne of these

12       shameful events, its found embodiment in the

13       Belmont Report.

14           The Belmont Report was written by the

15       National Commission for the Protection of

16       Human Subjects of Biomedical and Behavioral

17       Research.  The commission, created as a

18       result of the National Research Act of 1974,

19       was charged with identifying the basic

20       ethical principles that should underlie the

21       conduct of biomedical and behavioral

22       research involving human subjects and

PROCEEDINGS - November 22, 2021

```
 1          developing guidelines to assure that such
 2          research is conducted in accordance with
 3          those principles.   Informed by monthly
 4          discussions that spanned nearly four years
 5          and an intensive four days of deliberation
 6          in 1976, the commission published the
 7          Belmont Report which identifies basic
 8          ethical principles and guidelines that
 9          address ethical issues arising from the
10          conduct of research with human subjects.
11              One very specific thing is care should
12          be taken to ensure information about risks
13          should never be withheld for the purpose of
14          eliciting cooperation of subjects.
15              The Belmont Report is critical for
16          defining the concept of informed consent,
17          but especially in this context because it
18          speaks directly to the definition of
19          coercion and undue influence.
20              Coercion occurs when an overt threat
21          of harm is intentionally presented by one
22          person to another in order to obtain
```

PROCEEDINGS - November 22, 2021

Page 22

1           compliance.   Unjustifiable pressures usually

2           occur when persons of authority or

3           commanding influence, especially where

4           possible sanctions are involved, urge a

5           course of action for a subject.   Undue

6           influence, by contrast, occurs through an

7           offer of excessive, unwarranted,

8           inappropriate or improper reward or other

9           overture in order to obtain compliance.

10          Also, inducements that would ordinarily be

11          acceptable may become undue influences if

12          the subject is especially vulnerable.

13               Unjustifiable pressure usually when

14          persons in position of authority or

15          commanding influence, especially where

16          possible sanctions are involved, urge a

17          course of action for a subject.   A continuum

18          of such influencing factors exist, however,

19          and it is impossible to state precisely

20          where justifiable persuasion ends and undue

21          influence begins.   Undue influence would

22          include actions such as manipulating a

PROCEEDINGS — November 22, 2021

1          person's choice through the controlling

2          influence of a close relative and

3          threatening to withdraw health services to

4          to which an individual would otherwise be

5          entitled.

6                The American Medical Association Code

7          of Medical Ethics Opinion 2.1.1 states

8          informed consent of medical treatment is

9          fundamental in both ethics and law.

10         Patients have the right to receive

11         information and ask questions about

12         recommended treatments so they can make well

13         considered decisions about care.   Successful

14         communication of the patient-physician

15         relationship fosters trust and supports

16         shared decision making.

17                At every stage of my training I have

18         had the principle of informed consent

19         reinforced.   You require that I confer it on

20         our patients, and if I did not I would

21         rightly be justified for disciplinary

22         action.   Instead we have convened this

PROCEEDINGS - November 22, 2021

1        hearing because, as a patient, you want to

2        deny me informed consent.  You want to exert

3        the coercive pressure of the loss of my

4        training and my livelihood on the question

5        of whether I will take medicine that I don't

6        want while I am pregnant.  I would never, as

7        a matter of medical ethics and morality, put

8        my patients in such a situation, and, if I

9        did, you would be justified in firing me.  I

10       do not see how you could think that this

11       could possibly be acceptable.

12            I worked during the pandemic at this

13       hospital while pregnant with my first child

14       and became sick with COVID at just three

15       months postpartum while serving Northwell's

16       patients.  I put myself and my family at

17       considerable risk to answer the call to

18       provide medical service in your facilities.

19       I have performed well in all of my tasks.

20       In the process of denying my legitimate

21       medical and religious objections to

22       vaccination, you are looking past all of the

PROCEEDINGS - November 22, 2021

1          things that make me a person, a human being,

2          and you're reducing me to a single

3          characteristic.  This is dehumanizing and I

4          deserve better.

5                I have achieved natural immunity by

6          becoming sick with COVID in Northwell's

7          facilities.  There is no evidence anywhere

8          of a person with natural immunity conferring

9          the disease on another person.  There's no

10         evidence of any health reason for me to take

11         the vaccine or be fired for not taking it,

12         not a shred, and HHS admitted this only days

13         ago.

14               I have legitimate religious reasons

15         for declining the vaccine.  The law clearly

16         states that sincere religious beliefs are

17         easy to establish and that employers must

18         accommodate them.

19               For all of these reasons I

20         respectively ask that you reverse your

21         termination decision and reinstate me.

22               Thank you.

PROCEEDINGS - November 22, 2021

1          DR. BARONE:  Thank you for your

2     statement.

3          Dr. Sottile, now we move on to you, if

4     you have any documents you want to present

5     or witnesses you want to present.

6          DR. ZWEIFLER:  Just briefly.  There

7     was a sentence I missed.  She said something

8     admitted a few days ago.  What was that

9     sentence?  Admitted --

10          DR. D'CUNHA:  That a letter that --

11          DR. ZWEIFLER:  Can you just reread

12     that sentence?

13          DR. D'CUNHA:  Sure.  There is no

14     evidence of any health reason for me to take

15     the vaccine or be fired for not taking it,

16     not a shred, and HHS admitted this only days

17     ago.

18          DR. ZWEIFLER:  Thank you.

19          DR. SOTTILE:  Dr. Barone, the

20     testimonial outline that I have is just an

21     exhibit of contracts, statements, a fellow

22     -- a resident and fellow manual for which

PROCEEDINGS - November 22, 2021

1          all of the information is stating that our

2          residents are supposed to follow Northwell

3          policies.  If you want me to go through it,

4          I'll be happy to go through it.  I have all

5          the exhibits labeled.  It actually pertains

6          to the fact that at Northwell we informed

7          our residents in various exhibits that they

8          are to be compliant with Northwell Health

9          policies.

10              The short end of it is that when

11         Northwell mandated the vaccine and Candice

12         did not get vacc'd, then she was in breach

13         of her contract.  But if you want me to go

14         through that, I'll be happy to go through

15         it.

16              DR. BARONE:  I'll ask Dr. D'Cunha.  Do

17         you agree with the dates and timelines of

18         the letters that Dr. Sottile stated in his

19         opening statement, that you received letters

20         given the timeframe?  I think October 5th

21         and October 7th specifically were the dates.

22              DR. D'CUNHA:  There was a letter that

PROCEEDINGS - November 22, 2021

1           I initially received on October 1st that was

2       informing me of termination but it was

3       backdated to 9/28.   On that day -- I was

4       first told that I was terminated as of that

5       day, and later on that day I was informed by

6       Amy Durante that to hold on to my ID, not to

7       turn it in yet, because as a resident I

8       might possibly qualify for a later

9       termination date, but I had no idea what

10      that date was at the time.

11          I was also informed that I would

12      probably have access to an appeal.

13          DR. BARONE:   Thanks.   Do you have

14      those -- maybe put those letters --

15          DR. SOTTILE:   I can clarify that. On

16      October 5, 2021 Candice was provided a

17      letter reminding her that she needed to be

18      vaccinated or she would be terminated on

19      October 7th.   This letter gave her a final

20      chance to get vaccinated or she would be

21      terminated.   That's Exhibit 11.   If you'd

22      like to pull that up, that's the October 5th

PROCEEDINGS — November 22, 2021

1          letter.

2               MS. BRUNSON:  I'm going to share my

3          screen right now.

4               DR. BARONE:  Thank you.

5               MS. BRUNSON:  Can everyone see?

6               Dr. Sottile, is this the letter you're

7          referring to?

8               DR. SOTTILE:  This is the letter -- I

9          can't see the whole thing.  But yes, it was

10         delivered October 5, 2021.  That's it.

11         Correct.

12              MS. BRUNSON:  Just tell me to scroll

13         when you need me to scroll.

14              DR. SOTTILE:  You can scroll.

15              So as you're seeing, in paragraph 2 it

16         explains exactly what we stated.

17              If I can proceed.  She did not get

18         vaccinated as required, and then I gave

19         Candice a letter dated October 7th advising

20         her that because she was still not

21         vaccinated, she was being terminated and

22         being advised of the adverse action being

PROCEEDINGS - November 22, 2021

1          taken.  That's Exhibit 12 dated October 7th.

2               MS. BRUNSON:  Is this the letter that

3          you're referring to?

4               DR. SOTTILE:  That's correct.  Can you

5          scroll, please?  If you continue to scroll,

6          my signature should be on the bottom.  There

7          we go.

8               I spoke with Candice on October 8th

9          when she acknowledged receipt and had an

10         opportunity to ask questions.  That's

11         Exhibit 13, October 8th acknowledgement.

12         That's correct.

13              I gave Candice an opportunity to ask

14         any questions at that particular time.  She

15         did not have any.  There really was not much

16         to discuss.  We had been through it, and I

17         believe Candice knew that termination was

18         going to happen.  There wasn't much more to

19         say at that particular date.

20              Following that, she requested the

21         review by e-mail on October 8, 2021, Exhibit

22         14, which is an e-mail to Amy Durante and

PROCEEDINGS - November 22, 2021

Page 31

1           for which I was copied, and she stated her

2           reasons for her review.

3                   That's correct.  You can scroll.

4                   These were the reasons that were

5           given by Candice for the review.

6                   Dr. D'Cunha was provided a notice of

7           the review on November 4th, scheduled for

8           November 22, 2021 at 9 a.m., and I was also

9           copied.  That's Exhibit 15, notice of

10          review.

11                  That's correct.  That's correct.

12                  DR. BARONE:  Thank you.  Are there

13          any additional documents you want to share

14          before we call the witnesses?

15                  DR. SOTTILE:  No.

16                  DR. BARONE:  Any members of the

17          committee, anything you particularly want to

18          see that Dr. Sottile hasn't put up?

19                  (No response.)

20                  DR. BARONE:  Okay.  Do you want, is

21          it Dr. Lowe, to come in first?

22                  DR. SOTTILE:  I believe so.  Dr.

PROCEEDINGS - November 22, 2021

Page 32

```
 1           Lowe for the medical exemption and then Ms.

 2           Kahaner will address the religious

 3           exemption.

 4                   DR. BARONE:  Gus, can we let Dr.

 5           Lowe into the group?

 6                   MR. PHILLIPS:  Yes, sir.  We also

 7           have Ms. Kahaner in the waiting room.

 8                   DR. BARONE:  Thank you.

 9                   Dr. Lowe, welcome.

10                   MR. LOWE:  Good morning, everyone.

11                   DR. BARONE:  So the Program and the

12           Resident gave their opening statement.  The

13           Program presented a series of documents

14           outlining to Dr. D'Cunha the timeline of

15           adverse actions, and Dr. D'Cunha's document

16           for her appeal was shown.  I think your role

17           for this committee is to talk about your and

18           the Program and the system's thought to Dr.

19           D'Cunha's objection to getting a vaccine

20           based on a medical exemption.

21                   MR. LOWE:  Okay.  Dr. Barone, who

22           else is on the line now?  Will I be
```

PROCEEDINGS - November 22, 2021

1          introduced?  Are they on already?

2                    DR. BARONE:  Everyone is on.  We

3          have myself, the two other members of the

4          committee, Dr. Sottile and Dr. D'Cunha, and

5          then the medical transcriptionist and a

6          couple of people helping with the technology

7          and the documents.

8                    MR. LOWE:  Very good.  Thank you.

9                    DR. BARONE:  Do you want to give us

10         your official title?

11                    MR. LOWE:  Good morning, everybody.

12         My name is Dr. William Lowe, I am the

13         medical director for Employee Health

14         Services with Northwell.  I have been in

15         this role for a little over ten years now.

16                    A little bit about my background.  I

17         am board certified in residency training in

18         occupational medicine with a master's degree

19         in public health as part of that.  Again,

20         I've been in this role for ten years now.

21         This is sometimes referred to as Corporate

22         Employee Health Services.  I have not direct

PROCEEDINGS - November 22, 2021

Page 34

1           oversight but I have advice and guidance to

2           all the Employee Health Service across the

3           entire system, which number is seventeen.

4                   In regards to the medical exemption

5           process that was established by Northwell,

6           that was centered in my office.  All medical

7           exemptions from any employee anywhere in our

8           health system were sent here to my office,

9           Corporate Employee Health Service at 410

10          Bayville Road.  This is where we processed

11          and took the information in regarding their

12          medical exemption.

13                  Under the guidance of our Clinical

14          Advisory Group, which is a very high senior

15          level clinical leadership group for

16          Northwell that has been in place since

17          January, February of `20 when COVID first

18          started to become a reality for all of us,

19          the Clinical Advisory Group was established

20          under the leadership of our senior vice

21          president for quality for Northwell, and

22          that group has been responsible, and I will

PROCEEDINGS - November 22, 2021

1          say for all things COVID, whether they are

2          all clinical and administrative issues

3          around COVID.  Whether it was a patient care

4          algorithm, treatment, management of

5          employees, PPE, all the decision making,

6          visitors, all the decision making that had

7          to go around COVID and how that was going to

8          be managed from an infection prevention and

9          otherwise was managed by our Clinical

10         Advisory Group.

11              When the mandate was coming along

12         and we knew that the mandate was coming, we

13         were prepared for it.  The clinical advisory

14         group asked myself to establish a committee

15         that would look at all of our medical

16         exemption requests that came in.  I

17         established the committee, and that

18         committee was approved by the senior

19         Clinical Advisory Group for COVID.

20              So we did a couple things.  Dr.

21         Barone, I did just kind of -- I put together

22         just some documents that I thought the

PROCEEDINGS - November 22, 2021

1          committee -- not a lot, just a handful of

2          documents that I thought would be germane to

3          the committee, if they haven't seen them

4          before.

5                    Document number 1 is just the New

6          York State mandate.  10 NYCRR 2.61 is the

7          name of it.  That's a document that I do

8          think that the committee should have a look

9          at.  It's what dictated Northwell's

10         mandatory enforcement of the State's

11         mandatory guidelines.  It's rather lengthy.

12         I mean it doesn't have to be read in any

13         great detail but I do think it's important

14         that the committee know that this was

15         established under New York State.

16                    I will tell you Northwell was very

17         much prepared to -- we were very close to

18         making a mandate of our own, a system

19         mandate, but we never got there because the

20         State sort of preempted the need for that.

21         We established our mandatory vaccination for

22         COVID underneath the State guideline.

PROCEEDINGS - November 22, 2021

Page 37

```
 1          There's really no particular point here that
 2          I think needs to be pointed out other than
 3          it's several pages of what New York State
 4          established.  So I'll just leave it at that.
 5          At some point, if the committee has any
 6          questions to me regarding that, I'll be more
 7          than happy to come back to them.
 8              DR. BARONE:  Can I ask you one
 9          question?  Is there any specific, in the
10          State guidelines, exemptions, medical
11          exemptions or criteria for medical
12          exemptions written in the guidelines?
13              MR. LOWE:  There are not.  That's a
14          very good question.  There are no criteria
15          for exemptions.  That's something our
16          Clinical Advisory Group had to manage on its
17          own.  It's a very good question.  The State
18          does not dictate what is or is not a medical
19          exemption.  That's covered very much by the
20          CDC guidelines, which I'll reference later.
21              DR. BARONE:  Thank you.
22              MR. LOWE:  You got it.
```

PROCEEDINGS - November 22, 2021

Page 38

1              So folks, the next document that I

2       want to show is just to demonstrate that our

3       -- let me see here.  Document 2, the EHS

4       policy.  So we rapidly put this State

5       mandate into our EHS policy, which is

6       Exhibit 2.  This outlines, Dr. Barone, all

7       the things that we require for Employee

8       Health Service, the things you're familiar

9       with, measles, mumps, rubella, annual

10      testing.  Whatever it may be.  It's just our

11      general Employee Health Service policy.  We

12      did go ahead and immediately put that into

13      our policy.  Again, I'm not pointing out any

14      particular paragraph or anything.  I just

15      want the committee to be aware that we did,

16      in due diligence, make this part of our

17      policy.  That would be under section B,

18      number 3, COVID vaccination.

19          DR. BARONE:  Can we scroll to that,

20      please?  Okay.

21          MR. LOWE:  All right.  It would be

22      3-B.

PROCEEDINGS - November 22, 2021

Page 39

1              DR. BARONE:  Can you go back for a
2       second?  So specifically -- go up a little
3       more.  I saw that proof of -- it had to do
4       with proof of immunity.
5              DR. LOWE:  Right.  That would have
6       been for measles, mumps, rubella.
7              DR. BARONE:  Right.  I think it
8       specifically excludes COVID.
9              DR. LOWE:  Right.  COVID is proof of
10      adequate vaccination.
11             DR. BARONE:  I just want to -- can you
12      find that again?
13             MS. BRUNSON:  I'll scroll.  You let me
14      know where you see it.
15             DR. BARONE:  I thought it would be
16      important based on -- go up a couple more.
17             MR. LOWE:  Keep going down.
18             DR. BARONE:  I think this is
19      important.  One of Dr. D'Cunha's statements
20      was about the adequacy of her own natural
21      immunity.  This policy specifically excludes
22      that as being adequate --

PROCEEDINGS - November 22, 2021

Page 40

1           MR. LOWE:  It does.

2           Scroll down a little bit more.  So

3      it's proof of adequate vaccination, whereas

4      measles, mumps, rubella we have adequate

5      immunity for vaccination.  So thank you for

6      pointing that out.

7           DR. EL-SAYEGH:  Does Northwell policy

8      also state anywhere about any medical

9      exemption?

10          MR. LOWE:  No.  It was not in the

11     policy.  That was all handled by procedure,

12     and that is in the medical exemption

13     request.

14          DR. BARONE:  Okay.

15          DR. LOWE:  It was not policy.  That

16     was more procedure than policy.

17          DR. ZWEIFLER:  The decision to not

18     allow immunity, that was debated and a

19     discussed decision by the committee?  Can

20     you elaborate?

21          DR. LOWE:  It was discussed.  It was

22     discussed.  I wouldn't say debated.  I think

PROCEEDINGS - November 22, 2021

Page 41

1           the committee was unanimous.  The CDC

2           guidelines clearly -- do not clearly state

3           that you could be vaccinated following a

4           history of COVID as long as you're well

5           enough to be off of quarantine.  So very

6           early on after COVID there are no

7           contraindications to being vaccinated if you

8           had a history of COVID.

9                So we can -- I think we're good with

10          that.

11               I did want to go to Dr. D'Cunha's

12          medical exemption request.  I don't know if

13          you've already looked at that.  I can share

14          that with you.

15               Dr. D'Cunha, it's kind of HIPAA but I

16          know it was submitted to the committee.  I'm

17          assuming it's okay with you if I reference

18          that.  Is that correct?

19               DR. D'CUNHA:  That's correct.

20               DR. LOWE:  I have your permission?

21               DR. D'CUNHA:  Yes.

22               DR. LOWE:  So folks, here is the

PROCEEDINGS - November 22, 2021

Page 42

1          process.  It had to be requested by the

2          employee.  The request came from -- it did

3          come from Dr. D'Cunha.

4                  If you could scroll down, Tamira.

5                  There is some handwriting there.

6          Folks, I will tell you my office -- you

7          know, the entire committee took each of

8          these medical exemption requests very

9          seriously.

10                 You can stop right there, Tamira.

11         That's fine.

12                 I personally read everything that came

13         in from every single request.  I looked at

14         the handwriting, the handwritten notes of

15         this medical accommodation request, you

16         know, to try and identify what the medical

17         concern was.  I didn't see a medical concern

18         here.  This mostly spoke to I think some

19         State laws, some Federal laws and some other

20         type of concerns.  I did not see the medical

21         concern there.

22                 Tamira, if you scroll down, Dr.

PROCEEDINGS - November 22, 2021

1          D'Cunha did submit medical documentation,

2          meaning a note from a physician.  By the

3          way, also sent to us was this -- Tamira,

4          keep going down.  This was her antibody

5          level, greater than 250.  This is following

6          her COVID.

7                DR. BARONE:  Can you tell me the date

8          of this?

9                DR. LOWE:  Yes.

10               DR. BARONE:  If you scroll up.

11               DR. LOWE:  It looks to be --

12               DR. BARONE:  8/3.  Okay.

13               DR. SOTTILE:  Is there a statement

14         from her OB/GYN that he is in agreement with

15         Candice not receiving the vaccine?

16               DR. LOWE:  No.  Quite the contrary.

17         Right here, this is the doctor's note.  So

18         this is from Dr. Christopher LaPorta.  I'll

19         read it.  Dr. D'Cunha, date of birth,

20         (redacted), is currently under my care for a

21         current pregnancy EDC 3/6/22.  She currently

22         resides at 363 Graves Avenue, Staten Island

PROCEEDINGS - November 22, 2021

Page 44

```
1          10314.   COVID antibodies on 8/3/21 greater
2          than 250.   Request delaying administration
3          to after delivery.   I attest that I am not
4          related to this patient.   Thank you for your
5          consideration in this matter.
6               DR. SOTTILE:   That delay in
7          administration until after her due date, was
8          that considered?
9               DR. LOWE:   So our committee looked at
10         the issue of pregnancy -- the Clinical
11         Advisory Group looked at the issue of
12         pregnancy very seriously.   Again, we looked
13         for the -- primarily to the CDC.   There is
14         no contraindication to being vaccinated
15         during pregnancy.   We felt as though if we
16         were going to follow the CDC guidelines, we
17         were going to follow the CDC guidelines for
18         all groups that the CDC guidelines address,
19         including people who are pregnant,
20         undergoing fertility and/or lactating.   The
21         CDC clearly states that it is not only a
22         contraindication but it's a recommendation.
```

PROCEEDINGS - November 22, 2021

1          Folks, given any issue that may come

2     up within the CDC guidelines, if we look to

3     either support or contradict what the

4     guidelines were saying, we would turn to a

5     professional -- the professional

6     organization that's most universally

7     recognized as the entity to be an expert in

8     that area.  So we looked at guidelines from

9     the American College of Rheumatology if

10    there was a rheumatology related, American

11    Allergy, American College of Obstetricians

12    and Gynecologists.  We looked at all those

13    professional guidelines.  So although the

14    CDC was our primary document, very well

15    written, very extensive, really looking to

16    see what is a contraindication, why

17    shouldn't somebody be vaccinated, I don't

18    want to say that we only looked at the CDC

19    guidelines.  We did look for outside

20    expertise, and of course we also looked

21    inward.  At Northwell we have incredible,

22    incredible medical expertise in our health

PROCEEDINGS - November 22, 2021

Page 46

1          system.  We brought in experts from within

2          our own health system and sought guidance

3          from them when we thought it was necessary.

4                  DR. ZWEIFLER:  After this letter are

5          there more documents or that was the end of

6          the medical exemption request?

7                  DR. LOWE:  That was the end of --

8          there is a -- there's an e-mail I have from

9          Dr. D'Cunha on September 23rd.  It's more of

10         the same, quite frankly.  I don't really

11         think there's anything different or unique

12         in here.  It's basically a personal note --

13         in my opinion, a personal note about her

14         disappointment and things along those lines.

15         My office received no further medical

16         documentation, anything that was different.

17                 DR. D'CUNHA:  Dr. Lowe, may I just

18         point out a few things?  You mentioned that

19         in my medical accommodation request, that I

20         did not state anything about pregnancy.  In

21         my handwritten note, one of the first things

22         I say in there is I understand all of the

PROCEEDINGS - November 22, 2021

```
 1          foregoing to reference and be in accord with
 2          current State and Federal law regarding
 3          pregnancy and/or disability and reasonable
 4          accommodation in the workplace.  I did
 5          mention the fact about pregnancy.  There's
 6          also the note from my physician stating that
 7          I am pregnant.  The e-mail that I provided
 8          with regard to my re-appeal shared a lot of
 9          articles and a lot of papers and studies
10          that were done which indicated that there
11          was still an ongoing effort to establish the
12          safety of the vaccine in pregnant women.
13          All four package inserts for all four
14          vaccines that are currently available
15          mention the fact that you need to discuss
16          this with your OB.  They also mention
17          enrolling in a clinical trial in order to
18          continue monitoring women to see the side
19          effects.  The various data websites posted
20          close to 3,000 miscarriages.  So I'm not
21          entirely sure where the safety establishment
22          has been declared in terms of pregnancy.
```

PROCEEDINGS - November 22, 2021

Page 48

1            DR. LOWE:  Noted.  I've established

2      that the guidelines that the committee

3      followed, there is no contraindication to

4      pregnancy, and that was the standards by

5      which we moved forward to the highest levels

6      of the organization.

7            DR. EL-SAYEGH:  Can you share with us

8      the CDC that you just mentioned about

9      medical exemption, or what you referred to

10      earlier?

11            DR. LOWE:  So it's the CDC -- it's the

12      interim clinical considerations for the use

13      of COVID-19 vaccination.  It's rather

14      lengthy.

15            DR. BARONE:  Did you submit that to

16      the committee?

17            DR. LOWE:  Actually, I did not.  I

18      mean it's -- it's easily available online.

19      If you'd like, I could get this to the

20      committee.

21            DR. BARONE:  I think just the section

22      in regard to pregnancy may be useful to the

1          committee.

2               DR. LOWE:  Okay.  Is that something

3          you want me to pause and work on now to get

4          to you or we can get it to you after this?

5               DR. BARONE:  I think you can get it --

6               DR. LOWE:  How would I get something

7          to the committee?  I do have somebody in my

8          office that can help send stuff over.

9               DR. BARONE:  Why don't we try to work

10          on getting it before the meeting ends, this

11          way we can make sure everyone was privy to

12          that.  Again, all I need is really the

13          section.  Maybe you can PDF the section on

14          pregnancy.

15               DR. LOWE:  How can I get it to you?

16               DR. BARONE:  Tamira, is there a way he

17          can e-mail that to you, a PDF, and you can

18          share it?

19               MS. BRUNSON:  Dr. Lowe, do you have my

20          e-mail address, or do you want me to e-mail

21          you and you can reply?

22               DR. LOWE:  Yes.  Also e-mail it to

PROCEEDINGS - November 22, 2021

1           Tracy Striano, please.

2                MS. BRUNSON:  Okay.

3                DR. BARONE:  Thank you.

4                John, this is your witness.  Is there

5           anything else you want Dr. Lowe to try to

6           comment on?

7                DR. LOWE:  Dr. Barone, I don't mean to

8           interrupt.  This will be the section here.

9           Can you read that?  I will ask my secretary

10          -- my administrative assistant to send it

11          over to you folks.  It's consideration

12          involving pregnancy, lactation and

13          infertility. Okay.

14               DR. BARONE:  Terrific.

15               DR. LOWE:  I can pause and ask her to

16          start working on that or I can stay with

17          you.

18               DR. SOTTILE:  I'm just wondering if

19          there was any communication between EHS and

20          Dr. LaPorta regarding a decision and any

21          feedback from Dr. LaPorta, or was that just

22          end of story?

PROCEEDINGS - November 22, 2021

Page 51

1          DR. LOWE:  So folks, Northwell in

2     general did a lot of education of physicians

3     across the health system to sort of counter

4     what we considered -- what we considered to

5     be not the standard for our Northwell

6     patients.  You have to understand, most  --

7     not all, not all exemptions came from

8     Northwell Health.  We didn't have that kind

9     of reach. We do have the weekly chief

10    medical officer update.  It's almost an hour

11    long.  That goes out to all the physicians.

12    We did a lot of education on that.  Letters

13    from the chief medical officer.  Really,

14    quite frankly, asking physicians to stick by

15    known guidelines and expertise.

16          So there were literally hundreds,

17    hundreds of medical exemption requests

18    across all sorts of different reasons.

19    Individually that would have been almost

20    impossible to do.  We did recognize as a

21    committee that there needed to be a lot of

22    education of our Northwell physicians, and

PROCEEDINGS - November 22, 2021

1          we did that through the chief medical

2          officer.  So I don't know of an individual

3          conversation, it didn't come from me of an

4          individual conversation, with any physician

5          with perhaps one or two exceptions where I

6          needed to speak to them in order to --

7          pregnancy and history of COVID was a very

8          common request.  Our committee had looked at

9          many, many of these.  We universally decided

10         that pregnancy, without some other medical

11         thing that would make us question it, in and

12         of itself was not a contraindication, and

13         again was supported by CDC, ACOG, our

14         obstetrical leadership.  And history of

15         COVID.  Those are two things that really

16         weren't even that challenging for the

17         committee because we felt as though there

18         was so much good guidance out there, solid

19         clinical guidance, that that didn't really

20         need individual -- I didn't really -- we

21         didn't really need to hear other opinions on

22         that was our position.  Okay.

PROCEEDINGS - November 22, 2021

Page 53

1              DR. D'CUNHA:  I just have one last
2       question.  What is the purpose of
3       vaccination?  The COVID-19, what is the
4       purpose of it?
5              DR. LOWE:  Dr. Barone, is this -- I'm
6       not -- I'll answer if you'd like me to but I
7       don't know the point of it right now, quite
8       frankly.
9              DR. BARONE:  Just a short answer.  I
10      think since I'm going to -- you're going to
11      leave the committee, I think it's just --
12      it's due process to let Dr. D'Cunha at least
13      ask you a question or two.
14             Dr. D'Cunha, I'm not going to let you
15      get into a big debate.
16             DR. LOWE:  I would say particularly in
17      this setting of a global pandemic in a
18      healthcare institution where we are
19      absolutely responsible for the safety of our
20      patients, the purpose of the vaccine --
21      mandatory vaccine for healthcare workers and
22      Northwell's desire and obligation to enforce

PROCEEDINGS - November 22, 2021

Page 54

1          that mandate was about keeping our patients

2          safe.  I will end my comments there.

3                 DR. BARONE:  Dr. Lowe, I just want to

4          -- you brought this up as a question in my

5          mind.  I just want to reemphasize it so I'm

6          just a hundred percent crystal clear.  In

7          general, all requests for deferral of

8          vaccine based on pregnancy or prior immunity

9          were --

10                DR. LOWE:  Declined.

11                DR. BARONE:  -- declined?  Would that

12         be a fair statement?

13                DR. LOWE:  I would say there were

14         many, many, many, many in each of those

15         categories, and they were universally

16         declined as a reasonable medical exemption

17         based on the data that we have.  So yes.

18                DR. BARONE:  Okay.  Dr. Sottile,

19         anything else for Dr. Lowe?

20                DR. SOTTILE:  No.  We can bring on

21         Vicki Kahaner.

22                DR. BARONE:  Dr. D'Cunha, anything --

PROCEEDINGS - November 22, 2021

1           I don't want to get into a debate of science

2           here.  Anything in regards to process or

3           anything else you want to ask Dr. Lowe

4           about?

5                DR. D'CUNHA:  No.  That's fine.  We'll

6           get -- because the whole reason for getting

7           the vaccine, the COVID-19 vaccine, is to

8           establish antibodies.  When you acquire

9           COVID, you have antibodies.  I don't

10          understand why that is not accepted.  But as

11          Dr. Lowe mentioned, anybody who has had

12          COVID and who is pregnant was denied.  I

13          will leave it at that.

14               DR. BARONE:  I just wanted to

15          establish that you weren't singled out for

16          any reason.  That's what I wanted to make

17          clear to myself in my mind, that that was

18          kind of the policy.

19               DR. BARONE:  Committee members,

20          anything else for Dr. Lowe before I let him

21          go?

22               DR. EL-SAYEGH:  Dr. Lowe, did you

PROCEEDINGS - November 22, 2021

```
1          request from Dr. D'Cunha to get you more
2          medical evidence why she needed to be exempt
3          from the vaccine or her request was declined
4          and that was it?
5              DR. LOWE:  I'm sorry, Doctor.  I
6          apologize.  I don't fully understand the
7          question.
8              DR. EL-SAYEGH:  Based on the letter
9          that was submitted by the OB/GYN, did you
10          feel that she needed -- you needed or the
11          committee needed more information why she's
12          to be exempt from the vaccine besides the
13          fact that she's pregnant and she did not
14          provide you with this information or the
15          sole reason --
16              DR. LOWE:  No.  I would say honestly,
17          honestly -- again, we had so many of these
18          very similar pregnancies with a history of
19          COVID or just a history of COVID.  We had
20          debated that so many times and we had such
21          tremendously solid guidelines.  I mean ACOG
22          strongly recommended -- I mean the language
```

PROCEEDINGS - November 22, 2021

Page 57

1          is very clear.  CDC, the language is very

2          clear, strongly recommend.  I didn't feel it

3          was necessary in this particular case to go

4          back and establish anything with this

5          doctor.  There was no detail.  There was no

6          further decision making that really needed

7          to be here from our opinion.  Both of these

8          were, as I said, common, and they were

9          denied as medical exemptions to the

10         vaccination almost universally.

11              DR. BARONE:  Okay.  Thank you, Dr.

12         Lowe.

13              DR. LOWE:  I'm going to be sending

14         this to you right now.

15              DR. BARONE:  I appreciate it.

16              DR. LOWE:  Procedurally I'm going to

17         stay -- I'll go back to the waiting room and

18         wait to hear from you or am I done?

19              DR. BARONE:  Would it be -- can you do

20         other work while you're in the waiting room?

21              DR. LOWE:  Absolutely.  Absolutely.

22              DR. BARONE:  I don't think I'll need

PROCEEDINGS - November 22, 2021

Page 58

1           to recall you but I would appreciate you

2           hanging around while you do your other work

3           just in case.

4                   DR. LOWE:  If I'm gone -- I'm in the

5           clinic today, as you can tell by my dress.

6           We're a skeletal staff.  I'm trying hard to

7           get my staff out on some vacation after all

8           this time. I'm going to pop my head in the

9           clinic.  I'll be checking very, very

10          frequently.

11                  DR. BARONE:  I appreciate your time.

12                  DR. ZWEIFLER:  Can I ask a final

13          question?

14                  DR. BARONE:  Sure.

15                  DR. ZWEIFLER:  I'm just curious.  It

16          sounds like, if I understand correctly, that

17          Dr. D'Cunha presented some articles or some

18          data about miscarriages in pregnancies.  Did

19          the committee review the data she presented

20          and look at that or -- I don't know if I'm

21          understanding exactly what happened with

22          that evidence you guys looked at.

PROCEEDINGS - November 22, 2021

Page 59

1           DR. LOWE:  So again I'm going to go

2     back to what we used to look or to see if

3     there was a guidance of the recognized

4     entities.  Again, that was the American

5     College of Obstetricians.  Even the Maternal

6     Fetal Society.  If you started going out

7     into the internet sphere to look for a

8     reason not to get vaccinated, you could find

9     it.  We really felt as though this had to be

10    based on truly the established guidelines

11    and those well recognized, respected

12    professional entities.  Again, there's so

13    much information out there.  I'm not going

14    to say necessarily misinformation, but a lot

15    of it is misinformation that -- we did not

16    take every article or every internet site or

17    every -- everything that somebody could find

18    out there back to the committee for

19    discussion.  We did not feel as though that

20    was an approach for us enforcing a State

21    mandate, for not just pregnancy but for

22    anything.

PROCEEDINGS - November 22, 2021

Page 60

```
1          DR. SOTTILE:  But your committee did
2     look into the validity of those particular
3     articles that Candice sent?  Was that looked
4     into or were they just discarded?  Were
5     those articles looked at and the validity of
6     those articles?
7          DR. LOWE:  They were.  They were
8     reviewed by the committee, but I would not
9     use your terminology of discarded.
10    Honestly, if it wasn't from one of the
11    recognized -- I don't know what society --
12    the recognized society of podiatric surgery,
13    or whatever that may be.  You really could
14    tell from the outset that -- those were the
15    guidelines that we used.  The term
16    discarded, like I said, I read everything
17    that came in.  Everything was sent to the
18    committee, so --
19         DR. SOTTILE:  Thank you.
20         DR. BARONE:  Thank you.
21         Okay.  So I'm going to ask Dr. Lowe to
22    be removed from the meeting.  He's going to
```

PROCEEDINGS - November 22, 2021

Page 61

```
 1            remain on standby.

 2                    Can we, Gus, put the next witness up?

 3                    MR. PHILLIPS:  Dr. Lowe, if you look

 4            at the bottom of your screen there will be a

 5            breakout room icon.

 6                    DR. LOWE:  I do not see that.

 7                    MR. PHILLIPS:  Do you see the invite

 8            now?

 9                    DR. LOWE:  I see there's a drawing of

10            an icon for the head and shoulders.  Maybe I

11            should move my picture.

12                    MR. PHILLIPS:  Give me one second.

13            I'll close the rooms and then I'll reassign

14            you.

15                    Do you want me to wait before I let in

16            Ms. Kahaner?

17                    DR. BARONE:  No.  You can let her in

18            right away.

19                    (Whereupon, an off-the-record

20            discussion was held.)

21                    DR. BARONE:  Ms. Kahaner, can you

22            spell your name for the court reporter?
```

PROCEEDINGS - November 22, 2021

Page 62

1          MS. KAHANER:  K-A-H-A-N-E-R.

2          DR. BARONE:  Can you give her your

3     title, please?

4          MS. KAHANER:  Absolutely.  I'm vice

5     president of Employee Relations for

6     Northwell Health.

7          DR. BARONE:  I understand you're here

8     because you helped make determinations or

9     you and others helped make determinations on

10    religious exemption requests in regard to

11    the COVID-19 vaccine mandate.

12         MS. KAHANER:  Correct.  Part of my

13    team is the Advice and Council Center.  The

14    Advice and Council Center is a centralized

15    department that manages employee relation

16    issues throughout the organization, such as

17    disciplinary, advice for managers,

18    investigations, as well as accommodation

19    requests that come in.

20         DR. BARONE:  Okay.  Dr. Sottile, do

21    you want to ask your witness any questions

22    or let her make a statement?  It's your

PROCEEDINGS - November 22, 2021

Page 63

1           witness.

2                DR. SOTTILE:  I think, Vicki, if you'd

3           like to make a statement to inform us

4           exactly what Dr. D'Cunha's religious

5           exemption request was.

6                MS. KAHANER:  Sure.  Do you want me to

7           go to her request or do you want me to go

8           through the process that we --

9                DR. SOTTILE:  You can go through the

10          process.  Thank you.

11               MS. KAHANER:  Sure.  So I want to

12          start first with where we were as an

13          organization in regard to the mandate and

14          the religious exemptions.

15               Tamira, I think you have an Exhibit 5.

16          If we want to put that up.  Exhibit 5 is a

17          series of e-mails that are dated between

18          August 2nd and October 4th.  So in total

19          there are eight e-mails in here that were

20          sent, some to the entire organization and

21          some to those that were just not vaccinated.

22          So very quickly I'll take you through the

PROCEEDINGS - November 22, 2021

1          dates of each of the letters in the order

2          that they are listed in Exhibit 5.

3               August 2nd was an e-mail that was sent

4          to all team members informing them that we,

5          as an organization, are mandating the

6          vaccine, and that mandate will be in effect

7          as of August 16th.  Failure to be vaccinated

8          would lead to weekly PCR testing.  And so

9          that was the first announcement that went

10         out, and that was sent by Michael Dowling

11         and Mark Solazzo.

12            The second letter was dated August

13         10th.  These were all sent by e-mail to

14         employees' e-mail addresses in the

15         organization.  The August 10th was sent to

16         those team members that were still not

17         vaccinated, reminding them that we have a

18         mandate in place effective August 16th, and

19         failure to be vaccinated by that date would

20         lead to weekly PCR testing, just putting it

21         out there one more time to them.

22            Then the third letter is August 18th,

PROCEEDINGS - November 22, 2021

1          and this was sent right after the State

2          mandate was announced.  It was informing our

3          team members about the State mandate, and

4          PPE, and the date of the requirement to have

5          the vaccine as per the State mandate, as

6          well I think in here we give information

7          about how to get the vaccine.  We might also

8          in here talk about the PCR testing that has

9          to be done by everyone between that date and

10         the 27th.

11             Then there was a September 3rd e-mail

12         that was a reminder e-mail about the testing

13         requirement and the vaccine requirement.  A

14         lot of similar information.  That went out

15         on September 3rd.

16             September 15th we sent out another

17         e-mail because there seemed to have been a

18         lot of confusion in regards to a temporary

19         restraining order that the court had issued

20         in regard to religious exemptions.  We

21         wanted to inform the team members that we

22         will be compliant with the law and tried to

PROCEEDINGS - November 22, 2021

1        explain exactly what that temporary

2        restraining order meant.   A lot of people

3        were under the impression that the mandate

4        was put on hold, so we were making an

5        attempt to make sure that everybody was

6        aware it was still 9/27 as to the date that

7        it must be complied with, that we were

8        continuing to receive religious

9        accommodation requests and that we would be

10       determining what we would do for those as

11       time moved forward.

12            The next e-mail that was sent was on

13       the 21st of September, and this was

14       announcing to all team members what our

15       operational plans were as we approached the

16       9/27 deadline date and to ensure everybody

17       -- to ensure everybody that we had a plan in

18       place and we were ready operationally to

19       deal with anything that might come about.

20            The 9/28 e-mail was informing team

21       members that were not vaccinated that the

22       termination -- if failure to get the

PROCEEDINGS - November 22, 2021

1            vaccination at that point was going to be

2            leading to termination, and announcing also

3            that we had terminated several leaders

4            already for not being vaccinated.

5                    And then on the 4th -- the final

6            e-mail in this packet was on October 4th

7            informing everybody that we had reached a

8            hundred percent compliance with the vaccine

9            mandate and the only outliers for those

10           would be pending exemption requests.  I'm

11           not sure if that's in the e-mail but that

12           was our position at that point in time.

13                   So that's Exhibit 5.  You'll have the

14           opportunity to read those, I'm sure, after

15           this hearing.

16                   We had put a plan in place as to how

17           we would manage religious exemptions.  We

18           had created a form that could be utilized by

19           individuals requesting religious exemption.

20           That form was to be given to their local

21           site HR who would then forward it to the

22           Advisory Council Center, which is my team.

1          We would open up a case and we would manage

2          it going forward from there.

3              We had many discussions with senior

4          leadership as well as the clinicians, the

5          top clinicians in the organization, about

6          how we wanted to manage religious exemption

7          requests and what the law required.  What we

8          talked about was the safety of our patients

9          and the rest of the team members to have

10         unvaccinated individuals continue to work in

11         the workplace, and felt that we were putting

12         people at risk unnecessarily.  So the

13         decision was that anybody that put in a

14         religious exemption request at that point,

15         meaning after the TRO was issued, we would

16         be denying those requests that came in for

17         anybody that was patient facing or that we

18         believed would be putting others at risk if

19         they continued to work in the workplace.  So

20         that was a decision that came about after

21         significant discussion as to the protection

22         that we wanted to give our patients and the

PROCEEDINGS - November 22, 2021

Page 69

1           expectation our patients had.

2                 So I think, Tamira, if you can put up

3           Exhibit 6.

4                 Exhibit 6 will show you the form

5           itself that we asked everybody to fill out.

6           This is the resident form that was signed on

7           September 3rd.  I don't believe my team

8           received it for a couple weeks.  I'm not sure

9           where the delay might have been, but we

10          received it on the 30th of September and

11          opened a case.  You can see in here that she

12          changed some of the language, or, you know,

13          wrote some additional language on to the

14          team acknowledgement.

15                If you scroll down you will see her

16          specific -- on the next page will be her

17          specific request for a religious exemption.

18          I'm sorry.  It must be the third page.  So

19          on the third page she describes why she's

20          objecting on religious grounds for the

21          religious -- why she's requesting the

22          religious exemption, and she sets forth her

PROCEEDINGS - November 22, 2021

Page 70

1          objection to have any vaccine that had fetal

2          cells involved in the development of it.   So

3          this is what we had from her and this is

4          what we accepted from her.

5               Then what I can say is that we

6          accepted her statements as legitimate.   We

7          did not -- we did not pushback or object to

8          what she was saying.   We took it as fact

9          that she did have a sincere health belief,

10         and then we moved on to the next part of the

11         analysis which was would it create an undue

12         hardship.

13              And then, Tamira, if you can put up

14         Exhibit 7.

15              Exhibit 7 is the religious exemption

16         denial that my team sent out on behalf of HR

17         informing her that we had received it.   We

18         talk about the State mandate in there and we

19         talk about why we are denying it, which was

20         that we believed it created an undue

21         hardship because she is patient facing and

22         dealing directly and caring for patients,

PROCEEDINGS - November 22, 2021

1           which was consistent with the determination

2           that we made as an organization to what

3           would constitute an undue hardship for us.

4           This was dated on October 1st.  I'm not sure

5           when she received it but it was likely that

6           the e-mail went out with this attached on

7           October 1st.  That was the denial.

8                   So that was our process and that

9           was the timeframe.  I'm not sure exactly

10          what occurred after that. I wasn't involved.

11          This was the religious exemption process.

12                  I'd be happy to answer any questions.

13              DR. SOTTILE:  I have a question.  Did

14          you consider Dr. D'Cunha's religious

15          exemption based on her individual request or

16          had you already made up your mind that

17          Northwell was no longer accepting any

18          religious exemptions and that she was going

19          to be predetermined to be denied?

20              MS. KAHANER:  No.  We accepted -- so

21          there was a period of time where the State

22          had indicated that they would not be

PROCEEDINGS - November 22, 2021

Page 72

1          permitting religious exemptions.   That was

2          in August.   At that point in time we were

3          denying religious exemptions because the

4          State said they would not be permitting

5          them.   Then the temporary restraining order

6          was issued in December, and so anybody that

7          had received a denial was reconsidered based

8          on the fact that there was a temporary

9          restraining order issued.   So the

10         determination was made pursuant to the

11         guidance by the courts on religious

12         exemptions as to once you determine that

13         it's sincerely a health belief, as I stated

14         earlier we took the position it was a

15         sincere health belief, we would consider it

16         under the guidance of the EEOC and the

17         Federal courts as to whether or not an undue

18         hardship would be presented if we were to

19         grant it.   It was determined that clinicians

20         that were patient facing, anybody that was

21         unvaccinated in that scenario would create

22         an undue hardship.   So we did consider it

PROCEEDINGS - November 22, 2021

```
 1          fully and consistent with the guidance by
 2          the courts.
 3               DR. SOTTILE:  Did you accept any
 4          religious exemptions from any physician or
 5          resident fellow in direct patient contact?
 6               MS. KAHANER:  So we accepted the
 7          submission, but anybody that -- again,
 8          anybody that had direct patient contact
 9          would have been denied regardless of title.
10          It would have been physicians, nurses, PCAs.
11          Anybody that was going to be dealing
12          directly with patients was denied.
13               DR. SOTTILE:  Thank you.
14               DR. BARONE:  What is the current state
15          of affairs in regards to religious
16          exemptions in New York, you know, by the
17          courts?
18               MS. KAHANER:  So the Second Circuit
19          issued a determination in regard to two
20          cases.  I don't know exactly, you know, what
21          date it was issued.  Essentially it
22          supported the position that we took in
```

PROCEEDINGS - November 22, 2021

1          regard to anybody that is dealing directly

2          with patients would be creating an undue

3          hardship if they were not vaccinated.   I

4          know that there is language in the Second

5          Circuit decision that does support the

6          position that we did take.

7               DR. BARONE:  Would you say that your

8          -- I don't know if these are the right words

9          -- your hands are tied by the State, that

10         you really don't have an option of offering

11         religious exemptions?

12              MS. KAHANER:  I wouldn't say that. I

13         think that as an organization we had come to

14         that conclusion prior to the court issuing

15         that decision.   When the decision was issued

16         we felt very validated because it was the

17         same reasoning that we went through as to

18         make those determinations.   So I would say

19         that our decision was supported by the

20         courts.

21              We are still reviewing religious

22         exemptions that are currently pending for

PROCEEDINGS - November 22, 2021

```
1              those people that are not patient facing.

2              So we are still reviewing some.  There are

3              still some that are pending out there.

4                    I don't know if that answered your

5              question or not.

6                    DR. BARONE:  It does.  I don't know if

7              -- is the State mandate, again for receiving

8              the COVID vaccine, only for patient-facing

9              employees or is it for all?

10                   MS. KAHANER:  It's for people that

11             work in covered entities.  Covered entities

12             are Article 28s.  There's a whole list of

13             what is considered a covered entity.  Then

14             the covered personnel are those that work

15             within the covered entities.

16                   DR. BARONE:  I got it.

17                   MS. KAHANER:  That's the State

18             mandate.  Our mandate was for every employee

19             within Northwell regardless of whether or

20             not they were in a covered entity pursuant

21             to the State mandate.

22                   DR. BARONE:  Dr. Sottile, any
```

PROCEEDINGS - November 22, 2021

Page 76

1          additional questions?

2               DR. SOTTILE:  No, thanks.  None for

3          me.  Thank you.

4               DR. BARONE:  Committee members?

5               DR. ZWEIFLER:  No.

6               DR. BARONE:  Dr. D'Cunha, since I'm

7          going to let the witness leave in a second,

8          do you want to ask her a question?

9               DR. D'CUNHA:  I just want to clarify

10          with regard to the blurriness in regards to

11          my religious exemption submittal.  I had

12          actually submitted it in the first week of

13          September.  On September 30th I was

14          contacted by Kate Rafla who told me that

15          they could not find my religious exemption.

16          I had turned it in to the Northwell Health

17          site HR office.  I was told at the time that

18          religious exemptions weren't being accepted

19          but that a copy of my religious exemption

20          was made and that it will be kept with my

21          file.  So then I was reached out to on

22          September 30th by Kate Rafla.  I had no idea

PROCEEDINGS - November 22, 2021

Page 77

```
1          that my copy of my religious exemption had

2          been misplaced.  I had sent it to her late

3          that evening via fax.  It was sent to Kate

4          Rafla, and then the very next day, in the

5          morning, in the middle of seeing patients, I

6          received an e-mail saying that my religious

7          exemption was denied and within the hour I

8          was told that I would be terminated as of

9          that day.

10              So I just wanted to clarify that

11         timeline because that part was not known.

12              MS. KAHANER:  And that would be

13         correct.  I just want to add that at the

14         time on the 3rd we were not accepting

15         religious exemptions because a TRO had not

16         yet been issued and the State had said that

17         no religious exemptions would be permitted.

18         That makes sense that the site would not

19         have forwarded it to my office.  Then when

20         things opened up again after the TRO, there

21         were some individuals that had requests that

22         didn't make it in, but eventually every
```

PROCEEDINGS — November 22, 2021

1          request did make it to us and was

2          considered.

3               DR. BARONE:  Thank you.  Is it

4          possible that you can hang out in the

5          waiting room in case we need to recall you?

6          I don't know if I need to.  I don't know if

7          you have another place you need to go to.

8               MS. KAHANER:  I am fine to hang out

9          for a least another hour, hour and fifteen

10         minutes.

11              DR. BARONE:  Good.  I don't think it

12         will be longer than that.  I appreciate you.

13         Go do your work and we'll recall you in case

14         there's any clarifying issues we need.

15              MS. KAHANER:  Thank you very much.

16              DR. BARONE:  I appreciate it.

17              Dr. Sottile, any other witnesses or

18         comments or anything you want to show the

19         committee?

20              DR. SOTTILE:  No. I think we have all

21         the facts on the table.  There's not much to

22         discuss here.  It was a mandate, and

PROCEEDINGS - November 22, 2021

1           unfortunately Candice did not follow that

2           mandate so we had to pursue this as an

3           adverse action -- unusual adverse action.

4           It has to be taken as an adverse action if

5           we're not following the policy.  So I have

6           nothing further.

7                   DR. BARONE:  Thank you.

8                   Do any committee members have anything

9           to ask Dr. Sottile in regards to his

10          presentation?

11                  DR. EL-SAYEGH:  I just have a quick

12          question.  Which exemption was filed first,

13          the religious one or the medical one?

14                  DR. D'CUNHA:  The religious one first

15          and then the medical one after that.

16                  DR. EL-SAYEGH:  Thank you.

17                  DR. BARONE:  Okay.  So I think we turn

18          the meeting now to Dr. D'Cunha.  You now

19          have the opportunity to present witnesses or

20          documents that you want to share that

21          haven't been shared with the committee

22          already.

PROCEEDINGS - November 22, 2021

1          DR. D'CUNHA:  So I don't have any

2     witnesses.  As far as some of the links and

3     the things that I spoke about earlier in my

4     earlier statement, I can send that over to

5     Tamira once I get her e-mail address.  I can

6     send that over so you can have that to look

7     over.  I can also send you the links to the

8     articles that I did talk about in my medical

9     exemption re-appeal.  I do think if we're

10    going to accept some studies but neglect

11    others, then that's not really looking at

12    the science itself.  It's kind of being

13    biased in that regard.  If we're looking at

14    articles, we need to consider all articles.

15    We need to look at the various data.  Once I

16    get Tamira's information, I can send all of

17    those things over.

18          With regard to the decision that

19    Northwell has currently taken terminating my

20    employment and my training, it just -- right

21    now, as of this point in time, it feels that

22    if you have a religious belief and if you

PROCEEDINGS - November 22, 2021

Page 81

1          are pregnant, you are not being considered
2          as a person or as an individual.  You are
3          being considered as a number, as somebody
4          who can only do harm to patients.
5               Last year, before the vaccines were
6          there, we all worked without a vaccination.
7          We took precautions, we worked and we did
8          the best we could, and I did that again
9          while being pregnant.
10              To me it's not a very difficult
11         situation to see that yes, there was a
12         mandate put out, but we don't treat
13         individuals based on a general assumption.
14         For instance, we see a lot of diabetic
15         patients.  Not every single diabetic patient
16         that comes in gets the same medication to
17         control their blood sugar levels.  Everybody
18         is different and they get different
19         medications or different cocktails of
20         medications based on their individual health
21         and based on the fact that that's how we
22         treat and go about in medicine.

PROCEEDINGS - November 22, 2021

```
 1              The fact that I am questioning things.
 2      The fact that I'm saying look at me as an
 3      individual and treat me as a human being is
 4      not being taken into consideration.  I ask
 5      for you to take that into consideration when
 6      making your decision.
 7              DR. BARONE:  Thank you.
 8              DR. SOTTILE:  I would just like to add
 9      that Dr. D'Cunha was in good standing.  She
10      had completed all of her milestones
11      successfully through her PGY one year.  She
12      was a good resident and was here working
13      throughout the COVID during the deployment.
14      So I would just like to add that, that, you
15      know, she -- her qualifications and her
16      milestones were all met and there was no
17      problem ever with Dr. D'Cunha.
18              DR. BARONE:  Thank you.
19              MS. BRUNSON:  Dr. D'Cunha, is your
20      e-mail address candiceres90@gmail.com?
21              DR. D'CUNHA:  Yes.
22              MS. BRUNSON:  I just e-mailed you my
```

PROCEEDINGS - November 22, 2021

Page 83

1          information.

2               DR. D'CUNHA:  I will send everything

3          over.

4               DR. EL-SAYEGH:  Just one question.

5               DR. BARONE:  Okay.  Tamira, do you

6          have that CDC document yet that Dr. Lowe was

7          going to send over?

8               MS. BRUNSON:  I just got it.  Do you

9          want me to pull it up?

10               DR. BARONE:  Don't pull it up yet.  I

11          think we have a question.  Be ready in a

12          second.

13               Did you have a question, Dr.

14          El-Sayegh?

15               DR. EL-SAYEGH:  Yes.  Did Employee

16          Health share with you the articles and the

17          guidelines from ACOG and from the CDC that

18          they followed to make that decision of

19          declining your medical exemption?

20               DR. D'CUNHA:  Are you asking if I was

21          sent any of those articles?  No, I wasn't.

22               DR. BARONE:  Okay.  Tamira, can you

PROCEEDINGS - November 22, 2021

```
1              put up that article just so we can have it

2              on the record that we viewed it?

3                  I think we have to scroll down to -- I

4              think it's a big -- I'm looking for

5              something with -- right there.  Good.  Go up

6              a little bit so we can just read the first

7              paragraph.  Scroll back up a little bit.

8              Thanks.  Scroll up a little bit to the

9              pregnancy section.  Continue to scroll.  You

10             can continue to scroll, please.  Thank you.

11                 Dr. D'Cunha, can I ask you a question?

12             Have you received what would be considered

13             routine vaccines in the past?

14                 DR. D'CUNHA:  Yes.

15                 DR. BARONE:  So like flu vaccines, all

16             the other ones that --

17                 DR. D'CUNHA:  Last year I declined the

18             flu shot because I was pregnant.  So I

19             declined the flu vaccine then.

20                 DR. BARONE:  Traditionally you get the

21             flu vaccine and the DTaP and the other ones?

22             I guess I would refer to them as traditional
```

PROCEEDINGS - November 22, 2021

Page 85

```
1              vaccines.
2                   DR. D'CUNHA:  Yes.
3                   DR. BARONE:  You can stop screen
4         sharing, please.  Thanks, Tamira.  It makes
5         it easier for me to see everyone's face.
6                   You said you had a previous child?
7                   DR. D'CUNHA:  Yes.  I had my first
8         child October of last year.  I'm currently
9         pregnant with my second child.
10                  DR. BARONE:  Does this pregnancy
11        differ in regards to -- I guess I assume
12        your first child -- your first pregnancy
13        was, I don't want to use the word routine.
14                  DR. D'CUNHA:  Yes.
15                  DR. BARONE:  I would assume the second
16        pregnancy, again and please excuse my term
17        routine, but I know being pregnant is not a
18        routine thing.
19                  DR. D'CUNHA:  Right.  So far
20        everything, by the grace of God, has been
21        fine.
22                  DR. BARONE:  Okay, good.  And if you
```

PROCEEDINGS - November 22, 2021

Page 86

1           weren't pregnant would you have elected to

2           receive the vaccine?

3                DR. D'CUNHA:  My religious belief does

4           not want me to do that.  I have been a

5           practicing Catholic my entire life.  Ever

6           since I have learned of the involvement of

7           aborted fetal cells in the use of the

8           vaccine production or in terms of testing, I

9           have tried to stray away from those vaccines

10          and find ethical alternatives, not only for

11          myself but for my first born.  Whenever a

12          reason arises to wait to the ethical vaccine

13          comes out, I will be waiting until an

14          ethical vaccine comes out.  So I am against

15          the fact that children who are unborn and

16          have no say in the matter have been used

17          without their information, without their

18          consent in the production of vaccines.  It

19          doesn't feel right to me.  It doesn't sit

20          well with my religious practices or my

21          beliefs.  I wouldn't get it either way.

22               DR. BARONE:  So if -- I think your

PROCEEDINGS - November 22, 2021

Page 87

1        OB/GYN's statement said delay vaccine until

2        after you're not pregnant.

3            DR. D'CUNHA:  He mentioned delay.

4        That was based on a medical perspective and

5        what he thought.  It's not necessarily

6        reflecting my religious belief.  That was

7        what he thought in regards to from a medical

8        standpoint.

9            DR. BARONE:  Right.  My comment is so

10       you -- after you've delivered you're not

11       planning on receiving the vaccine based on

12       your religious --

13           DR. D'CUNHA:  Based on my religious

14       beliefs.  Correct.

15           DR. BARONE:  Even if they say, you

16       know, a reason for subsequent employment?

17           DR. D'CUNHA:  Could you repeat the

18       last sentence?

19           DR. BARONE:  I guess potentially after

20       you deliver, if the medical exemption goes

21       away --

22           DR. D'CUNHA:  Right.

PROCEEDINGS - November 22, 2021

1          DR. BARONE:  -- and someone offered

2     you a job but you needed the vaccine, you

3     would not get the vaccine in order to be

4     employed?

5          DR. D'CUNHA:  Correct.  If there was

6     an ethical alternative, I would take that

7     into consideration.  As of now all four

8     vaccines that are available have used

9     aborted babies in terms of the production or

10    in terms of testing.  So at this time; no, I

11    would not.

12         DR. BARONE:  So I would assume that

13    although you filed both a medical and a

14    religious exemption, I don't know if this is

15    the right word, but the religious exemption

16    is the more defining one in your decision

17    not to get the vaccine based on what you're

18    telling me now?

19         DR. D'CUNHA:  I think I would have

20    liked both to be taken into consideration,

21    because at this point in time they have

22    halted my training in October whereas if the

PROCEEDINGS - November 22, 2021

Page 89

1           company had considered my medical exemption

2           I would have been almost through with my

3           second year of training.  Now one-third of

4           the way, or less than one-third of the way

5           through my second year they are holding my

6           training, holding my health insurance,

7           holding my income.  My daughter was a

8           dependent on my health insurance, and that

9           was taken away from her as well.  So a lot

10          has been taken away from me in this process.

11              DR. BARONE:  I understand the medical

12          exemption would have helped continue your

13          benefits until that time.

14              DR. D'CUNHA:  My benefits, my

15          training.  I mean we've all been through

16          this process.  We put in years of not just

17          sacrifice and time and income and all sorts

18          of things, but there's hard work put into it

19          too.  Why would anybody want their training

20          to be halted midway through?

21              DR. BARONE:  I appreciate that.

22              I think some of the committee members

PROCEEDINGS - November 22, 2021

1          were trying to ask questions.  I'll be quiet

2          and let you guys go.

3               DR. SOTTILE:  Candice, I just want the

4          committee to understand that you have an

5          understanding that your career may be

6          terminated if you fail to get vaccinated in

7          the future.  I just want the committee to

8          understand that you do understand that if

9          you decide not to be vaccinated, your whole

10         career may be terminated.  You do understand

11         that?

12              DR. D'CUNHA:  I understand to the

13         extent that as of right now there is no

14         accommodation for someone's religious

15         exemption being made.  So if a religious

16         exemption was to be accepted, because that

17         conversation has been changing on a weekly,

18         monthly basis.  To that effect, if that

19         decision was to change once again in the

20         court system, then anybody who was

21         terminated for a religious exemption not

22         being accepted should be reconsidered again.

PROCEEDINGS - November 22, 2021

```
1              DR. ZWEIFLER:  About supporting

2         documentation from a religious leader, I am

3         not sure if I'm misinformed but my

4         understanding was that the head of the Roman

5         Catholic religion did not support that

6         position.

7              DR. D'CUNHA:  Yes.  So the pope is not

8         infallible.  He can make an opinion but he

9         is not infallible.  Every person, every

10        Catholic, every practicing Catholic, we are

11        part of the Catechism of the church.  The

12        pope can have an opinion, and I do respect

13        the pope for his opinion, but he is not

14        infallible.  I think that's something one

15        has to take into consideration.  This was an

16        opinion on a medical matter, not a faith

17        matter.  That has to be taken into

18        consideration.  That's part of our Catechism

19        as well.

20             DR. ZWEIFLER:  Was there an

21        alternative religious support for this

22        position?
```

PROCEEDINGS - November 22, 2021

Page 92

1            DR. D'CUNHA:  There has been a split

2       within the Catholic church on the opinion

3       regarding the vaccination because there is

4       the matter of the aborted babies being used

5       and continuing to be used in the production

6       or testing of the vaccine.  Until an ethical

7       form of testing and production is taken into

8       consideration, this vaccine is not going to

9       be fully accepted by everybody in the

10      Catholic church.  I think when an ethical

11      alternative comes into play, then we can

12      talk some more.  Until then, the court has

13      -- the court should rule to allow people to

14      have a religious belief, because if we don't

15      have our religious beliefs than where is our

16      freedom to believe in what we believe in?

17           DR. BARONE:  Dr. El-Sayegh, do you

18      have any last questions for Dr. D'Cunha?

19           DR. EL-SAYEGH:  I'm okay.  Thank you.

20           DR. BARONE:  If there's no objection,

21      I'm going to -- don't close out, Gus. I may

22      want to have the committee members stay on.

PROCEEDINGS - November 22, 2021

1          If I have no objection, I'm going to adjourn

2      the meeting.  Any objection?  Dr. D'Cunha?

3          DR. D'CUNHA:  No.

4          DR. BARONE:  Dr. Sottile?

5          DR. SOTTILE:  No.

6          DR. BARONE:  All right.  So Michelle,

7      you can have the meeting as brought to a

8      close.

9

10         (Whereupon, the proceedings were

11     concluded at 10:40 a.m.)

12

13

14

15

16

17

18

19

20

21

22

PROCEEDINGS - November 22, 2021

Page 94

1

2                     C E R T I F I C A T I O N

3

4

5                 I, MICHELLE CONERO, a Notary Public

6       for and within the State of New York, do hereby

7       certify:

8                     That hereinbefore set forth is a true

9       record of the proceedings.

10                    I further certify that I am not

11      related to any of the parties to this proceeding

12      by blood or by marriage and that I am in no way

13      interested in the outcome of this matter.

14                    IN WITNESS WHEREOF, I have hereunto

15      set my hand this 1st day of December 2021.

16

17

18

19

20                        _____
                                   MICHELLE CONERO

21

22

**EXHIBIT K**





*269-01 76th Ave, Suite C-028*
*New Hyde Park, NY 11040*
*Phone: (718) 470-3204*

**Stephen R. Barone, MD, FAAP**
Vice Chairman for Education
Program Director
Cohen Children's Medical Center
Associate Professor of Pediatrics
Zucker Northwell School of Medicine

## <u>REPORT OF THE ADVERSE ACTION REVIEW COMMITTEE</u>

**TO:**     John Sottile, M.D.
             Candice D'Cunha, D.P.M.

**FROM:**  Adverse Action Review Committee

**DATE:**  December 23, 2021

---

<u>Committee Members:</u>

Stephen Barone, M.D., Program Director, Pediatric Residency Program, Cohen's Children's
Medical Center (Chair)
Suzanne El-Sayegh, M.D., Associate Chair of Medicine and Program Director, Internal Medicine
Residency Program, Staten Island University Hospital
Rebecca Zweifler, M.D., PGY-3, Internal Medicine Residency Program, Lenox Hill Hospital

Pursuant to Northwell Health's Office of Academic Affairs ("OAA") Policy #7, Due

Process For Adverse Actions Taken Against Residents/Fellows, Section III 5(c), this Adverse

Action Review Committee ("Committee") was appointed to provide Candice D'Cunha, D.P.M.

("Dr. D'Cunha") with a review of the October 5, 2021 termination decision ("Adverse Action")

of the Staten Island University Hospital Podiatric Medicine and Surgery Residency Program

("Program").

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO**
**NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

*setting new standards in children's healthcare*

The Committee held its review meeting on November 22, 2021. Because Dr. D'Cunha elected to proceed without being represented by an attorney, pursuant to OAA Policy #7A, neither the Program nor Committee had an attorney present at the review. The meeting was transcribed by a stenographer, and a copy of the transcript was provided to the Committee, to the Program, and to Dr. D'Cunha.

The Committee heard testimony from John Sottile, M.D., Program Director of the SIUH Podiatric Residency Program, from William Lowe, M.D., Medical Director of Northwell Health's Employee Health Service, from Vicki Kahaner, Vice President of Northwell Health Employee Relations, and from Dr. D'Cunha.

Documents accepted into evidence consisted of exhibits submitted by the Hospital, numbers 1-15; described in detail below. In addition, the Program provided the Committee with CDC guidelines concerning vaccination of pregnant persons, which the Committee will deem Program Exhibit 16. Dr. D'Cunha also provided the Committee with exhibits, also described below.

## THE PROGRAM'S EXHIBITS

Exhibit 1:     A copy of 10 N.Y.C.R.R. §2.61, which is the New York State regulation that requires healthcare worker to be vaccinated against COVID-19. §2.61, effective August 26, 2021 provides, in relevant part:

        (a)(1)     Covered entities...include (i) any facility or institution included in the definition of hospital in section 2801 of the Public Health Law...

        (2)     Personnel...shall mean all persons employed or affiliated with a covered entity...including students...who engage in activities such that if they were infected with COVID-19 they could potentially expose other covered personnel, patients or residents to the disease.

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

(c)    Covered entities shall continually require persons to be fully vaccinated against COVID-19 with the first dose by September 27, 2021 for general hospitals…absent receipt of an exemption…

(d)(1)    Medical exemption…If any licensed physician…certifies that immunization with COVID-19 vaccine is detrimental to the health…based on a pre-existing health condition, [the vaccine requirement] shall be inapplicable only until such immunization is found no longer to be detrimental to such [person's] health.

Exhibit 2:    Northwell Health's Human Resources Policy and Procedure Manual, Part 10, Section 1.  At page 5, it provides that all team members must be vaccinated against COVID-19, and that failure to do so may result in termination of privileges/employment/relationship with Northwell.

Exhibit 3:    Dr. D'Cunha's September 9, 2021 request for a medical exemption from the vaccine requirement based on her pregnancy and natural immunity.

Exhibit 4:    September 20, 2021 letter to Dr. D'Cunha advising that her request for a medical exemption is denied; and September 29, 2021 letter to Dr. D'Cunha advising that after re-submission, her request for a medical exemption is still denied.

Exhibit 5:    A series of eight emails from Northwell Health to all employees advising them of the vaccine mandate.

Exhibit 6:    Dr. D'Cunha's request for a religious exemption, dated September 3, 2021.  Dr. D'Cunha states that as a Roman Catholic, she is opposed to taking a vaccine developed using aborted fetal cells.

Exhibit 7:    October 1, 2021 letter to Dr. D'Cunha advising that her religious exemption request is denied.

Exhibit 8:    Dr. D'Cunha's PGY-2 contract.

Exhibit 9:    OAA Resident/Fellow Manual.

Exhibit 10:    Northwell Health Code of Ethical Conduct.

Exhibit 11:    October 5, 2021 letter to Dr. D'Cunha advising that in the absence of vaccination, her employment as a resident in the Program will be terminated effective October 7, 2021.

Exhibit 12:    October 7, 2021 letter to Dr. D'Cunha advising that her participation in the Program is terminated and she has a right to request a review.

Exhibit 13:    Acknowledgment of receipt of notice of termination, signed by Dr. D'Cunha and dated October 8, 2021.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

Exhibit 14:   October 11, 2021 email from Dr. D'Cunha stating the following reasons for her request for a review:

1. There is no rational basis to terminate her for refusing the COVID-19 vaccine while she is pregnant, as a) the safety of the vaccine for pregnant women is not established; b) studies indicate cause for concern; and c) she has natural immunity.

2. Her termination violates the Pregnancy Discrimination Act.

3. Her termination violates the Civil Rights Act of 1964.

4. Termination based solely on vaccination status is inconsistent with due process.

Exhibit 15:   November 4, 2021 letter to Dr. D'Cunha notifying her that the review will take place on November 22, 2021, identifying the review committee members, and providing copies of OAA Policies #7 and 7A.

Exhibit 16:   CDC Guidelines, last updated November 19, 2021, regarding vaccination of pregnant persons against COVID-19. The CDC Guidelines provide in relevant part:

**Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States**

COVID-19 vaccination is recommended for everyone aged 5 years and older in the United States for the prevention of coronavirus disease 2019 (COVID-19)...

COVID-19 vaccination is recommended for people who are pregnant, lactating, trying to get pregnant now, or who might become pregnant in the near future...

There is no evidence that any of the COVID-19 vaccines affect current or future fertility...

A growing body of evidence on the safety and effectiveness of COVID-19 vaccination—in both animal and human studies—indicates that the benefits of vaccination outweigh any known or potential risks of COVID-19 vaccination during pregnancy...

COVID-19 vaccination is recommended for all people who are pregnant. A conversation between the patient and their clinical team may assist with decisions about the use of a COVID-19 vaccine; however, approval by a healthcare professional is not required before vaccination.

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## DR. D'CUNHA'S EXHIBITS

After the review meeting, Dr. D'Cunha provided the OAA with the following, which we made available to and reviewed by the Committee:

1.  September 2, 201 letter from Christopher LaPorta, M.D., advising that Dr. D'Cunha is under his care for her current pregnancy.  The letter states that her current COVID antibodies on August 3, 2021 are greater than 250, and further states "Request delaying vaccine administration to after delivery."

2.  A copy of Dr. D'Cunha's COVID-19 Antibody test result dated August 4, 2021.

3.  Letter from Dr. D'Cunha to Employee Health Service requesting reconsideration of its denial of her request for a medical exemption.

4.  A December 14, 2020 statement by the Academy of Breastfeeding Medicine.

5.  Undated vaccine data report that appears to be from "MotherToBaby" regarding observational studies.

6.  November 5, 2021 letter from the CDC to Elizabeth Brehm, Esq., regarding a Freedom of Information Act request.

7.  A printed copy of Dr. D'Cunha's opening statement.

## STANDARD OF REVIEW

Pursuant to OAA Policy #7A, Adverse Action Review and Appeal Rules and Regulations, Section II A(4) (Binder, Tab 9), to reverse the Adverse Action, the Trainee shall have the burden to persuade the Committee that the Trainee failed to receive notice of his/her deficiencies in the ACGME Core Competencies and a reasonable opportunity to remedy same; or that the Adverse Action lacks any factual basis or is not in compliance with ACGME, AOA, CODA, CPME or Northwell policies, including those contained in the house staff manual.

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## SUMMARY OF EVIDENCE PRESENTED

### The Program's Evidence

The Program first witness was Dr. Sottile.  He testified to the following in his opening statement:  Dr. D'Cunha started her PGY-1 year in June, 2020.  During the summer of 2021, the State issued a vaccine mandate for all health care workers, requiring vaccination by September 27, 2021.  Northwell adopted a similar policy.

Dr. D'Cunha chose not to be vaccinated.  Dr. Sottile discussed it with her several times but she did not change her decision, and accordingly was terminated on October 7, 2021. (T. 12-14).

Next, Dr. D'Cunha provided an opening statement, which consisted of the reasons for her appeal, as set forth in Program Exhibit 14, which is her October 11, 2021 email described above. Dr. D'Cunha then read a statement that analogized the vaccine mandate to forced medical treatment and medical research without informed consent eugenics, Nazism, and coercion. (T. 16-25).

Dr. Sottile then testified, and reviewed the Program's time-line and exhibits as described above. (T. 26-32).

Dr. Lowe then testified to the following:  He is the Medical Director of Northwell Health, Employee Health Service, and has served in that capacity for 10 years. (T. 33).  His office reviewed all requests for medical exemptions.

A Clinical Advisory Group ("CAG") was established, a high level senior clinical leadership group to address COVID-19 issues.  The CAG asked Dr. Lowe to form a committee

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

to review all medical exemption requests:  He did so and the committee was approved by the CAG. (T. 35).

Northwell was in process of preparing its own vaccine mandate but the state pre-empted that. (T. 36).

Northwell's Employee Health Services policy regarding vaccines is that vaccination or proof of natural immunity is okay for measles, mumps and rubella, but not for COVID, for which actual vaccine is required. (T. 39-40).

Dr. Lowe's committee reviewed Dr. D'Cunha's medical exemption request, and noted that it was not supported by a physician note stating that the COVID-19 vaccine would be harmful to her.

CDC Guidelines recommend COVID-19 vaccine for all people.  Dr. Lowe's committee decided to follow the CDC Guidelines, (T. 44).  It also looked at guidelines from the American College Obstetricians and Gynecologists ("ACOG").

"The committee decided that pregnancy, without some other medical thing that would make us question it, in and of itself was not a contraindication, and…was supported by CDC, ACOG [and] our clinical leadership." (T. 52).  Accordingly, all requests for deferred vaccine based on pregnancy or prior immunity were declined. (T. 54).

Regarding articles provided by Dr. D'Cunha, Dr. Lowe testified that if you go to the internet to look for a reason to not get vaccinated, you could find it.  There is a lot of

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

7

6325727v.9

misinformation out there.   Dr. Lowe's committee felt that its decisions should be based on established guidelines by well recognized and respected professional entities. (T. 59).

The Committee then heard testimony from Vicki Kahaner, the Vice President of Employee Relations at Northwell Health. (T. 62).   Northwell's Advice & Counsel Center handled all religious accommodation requests.

Ms. Kahaner then reviewed eight emails sent to all Northwell Health employees from August 2 – October 4, informing and advising them regarding the vaccine mandate. (Program Exhibit 5).

All requests for religious accommodation were considered.   If the request was from an employee who was patient facing, it was denied as an undue hardship to Northwell.

Dr. D'Cunha, when asked by the Committee, testified that she would not get vaccinated even if not pregnant, due to her religious beliefs. (T. 86-88).

## COMMITTEE FINDINGS

The committee was unanimous in their decision that Dr. D'Cunha did not meet her burden to have the adverse action reversed.   This was based on the committee's determination that she received proper notification and due process throughout the timeline that led to her ultimate termination.

The reasons for the committee's decision are outlined below:

1. Dr. D'Cunha asserts that her termination based solely on the vaccine mandate violates various laws and her due process rights.   The Committee is advised by counsel that

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

multiple legal challenges to the mandate have been rejected by the courts, including the U.S. Supreme Court, which on December 13, 2021 denied an emergency request to block the mandate.  It is not the role of this Committee to review and decide the legality of a State healthcare regulation.  Because the regulation does not permit religious exemptions (as distinct from accommodations, discussed below), the denial of Dr. D'Cunha's request for a religious exemption was appropriate.

2. Northwell's policy that mandates the necessity of a COVID vaccine to maintain employment was provided to and discussed with D'Cunha on multiple occasions.  She declined all opportunities to receive the vaccine and comply.

3. The process Dr. Lowe described that led Northwell to decline Dr. D'Cunha's request for a medical exemption was deemed appropriate and was not applied to Dr. D'Cunha in a capricious manner.   The Committee does not feel it is in their purview to challenge the medical expertise of the Northwell's Clinical Advisory Group regarding the safety and benefits of the COVID vaccine in pregnancy.   The Committee feels that the CAG decision to follow guidance from the CDC and ACOG was reasonable and appropriate. Despite that view, the Committee did take the time to review the exhibits provided by Dr. D'Cunha and did not feel they were persuasive in view of CDC and ACOG guidance. There is wealth of information which describes breakthrough COVID disease in previously infected individuals and therefore the potential to spread the disease to others, including patients.  The Committee also notes that Dr. D'Cunha's medical exemption request was not supported by a note from a licensed physician certifying in that the

---

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

COVID-19 vaccine would be detrimental to her health; thus the request did not meet the medical exemption requirement of §2.61.

4. The process Ms. Vicki Kahaner described that led Northwell to decline Dr. D'Cunha's request for a religious accommodation was deemed appropriate and was not applied to Dr. D'Cunha in a capricious manner. The Committee is advised by counsel that employers may grant a religious accommodation (not an exemption) so long as the employee does not interact with patients, and may be denied if it would be an undue hardship.  The Committee accepts Ms. Kahaner's testimony that it would be an undue hardship to grant a religious accommodation to Dr. D'Cunha.

5. The Committee would like to note that its decision to affirm the decision to terminate Dr. D'Cunha was not based on performance issues, but rather her decision to not follow a Northwell policy and New York State regulation which requires vaccination for continued employment.

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

## CONCLUSION

For the above reasons, the Committee votes unanimously to uphold the Dr. D'Cunha's termination from the Program.

Dated: <u>December 23, 2021</u>

By:   Stephen Barone, M.D.
      Committee Chair

**CONFIDENTIAL AND PRIVILEGED PEER REVIEW REPORT PURSUANT TO
NEW YORK PUBLIC HEALTH LAW § 2805 AND EDUCATION LAW § 6527**

6325727v.9

**EXHIBIT L**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
District Office: (212) 336-3620
General FAX: (212) 336-3625

**Candice D'Cunha**
**236 Graves St.**
**Staten Island, NY 10314**

*Re:    EEOC Charge No.520-2022-00721*
       *Candice D'Cunha v. Staten Island University Hospital/Northwell Health*

**Dear Dr. D'Cunha:**

**This office is in receipt of your request for a *Notice of Right to Sue* on the above-referenced charge.**

**Ordinarily, a charging party or his/her counsel is not entitled to receive a *Notice of Right to Sue* upon request until the charge has been pending with the EEOC for at least 180 days. However, an early *Notice of Right to Sue* is authorized by 29 C.F.R. § 1601.28(a)(2) if the Director determines that the Commission will not be able to complete its administrative process within 180 days of the date the charge was filed.**

**We have reviewed all of the circumstances of this case and have determined that issuing you the requested *Notice of Right to Sue* is warranted at this time. Specifically, given our office's current workload, we have concluded that the EEOC will be unable to complete the processing of this charge within 180 days of the date the charge was filed.**

**Enclosed is your *Notice of Right to Sue*. If you have any questions, please contact Investigator Glendora Young at (929) 506-5290.**

**On Behalf of the Commission**

_____                    _____For
**Date**                                    **Judy Keenan**
                                           **Director**

**Enc.**

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Candice D'cunha**
**236 Graves St**
**Staten Island, NY 10314**

From:  **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2022-00721** | **Glendora M. Young,**<br>**Investigator** | **(929) 506-5290** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____   For   _____

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

cc:  **Lorin Weiner**
**Director of Human Resources**
**STATEN ISLAND UNIVERSITY HOSPITAL/ NORTHWELL**
**HEALTH**
**475 Seaview Ave**
**Staten Island, NY 10305**

Enclosure with EEOC
Form 161-B (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS      --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you** *receive* **this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to
consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or
record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you
did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was**
*issued* **to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office.  If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

PRIVATE SUIT RIGHTS      --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
<u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION   --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE      --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request <u>within 6 months</u> of this Notice**.  (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc:

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)),  **"major life activities"  now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:  Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.